SIXTH DIVISION
December 31, 2009

No. 1-08-0657

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| | ) | |
| | ) | No. 05 CR 19800 |
| v. | ) | |
| | ) | |
| AMIR KANDO, | ) | Honorable |
| | ) | Catherine M. Haberkorn |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

## I. NATURE OF THE CASE

Defendant, Amir Kando, was arrested and charged with aggravated battery and attempted murder of his neighbor, Jason Burley. At his bench trial, defendant raised the insanity defense pursuant to section 6-2 of the Criminal Code of 1961 (Code) (720 ILCS 5/6-2 (West 2004)). The trial court found defendant guilty but mentally ill and subsequently sentenced him to 15 years' imprisonment. On appeal, defendant makes several contentions. He first argues that his conviction should be reversed because the trial court's finding of guilty but mentally ill was against the manifest weight of the evidence. In the alternative, defendant contends that his cause should be remanded for a new trial because he was denied his right to due process when the trial court failed to correctly recall and consider testimony by several witnesses, whose testimony was

1

crucial to defendant's insanity defense, and where it instead relied on matters that were not part of the record. Defendant also asserts that he was denied his constitutional right to effective assistance of counsel, where counsel: (1) failed to properly handle his insanity defense by failing to impeach two of the State's key witnesses, and (2) failed to object to a discovery violation by the State. Defendant finally contends that even if his conviction is affirmed, we should nevertheless remand for a new sentencing hearing because the trial court abused its discretion when it sentenced him to 15 years' imprisonment, a sentence nine years above the statutory minimum.[1] For the reasons set forth below, we reverse.

## II. BACKGROUND

We begin by noting the relevant procedural history and the facts set forth in the record before us. On July 23, 2005, defendant was arrested in his residence at 2515 North Sawyer Avenue in Chicago, for committing an aggravated battery against the victim, Jason Burley. The arrest report prepared by Chicago police officers Hamid and Eberlynn states that defendant was placed into custody "after he stabbed his neighbor [Burley] over an argument about 'Jesus is black.'" The arrest report further states that defendant "admitted to stabbing" the victim and that he "suffers from 'schizophrenic bipolar anxiety.' "

Pursuant to his arrest, defendant was subsequently charged with one count of attempted

---

[1]We note that the statutory range for attempted murder is between 6 to 30 years' imprisonment. See 720 ILCS 5/8-4(c)(1) (West 2002) (attempt first degree murder is sentenced as a Class X felony); see also 730 ILCS 5/5-8-1(a)(3) (West 2002) (sentence for Class X felony is 6 to 30 years' imprisonment)).

2

No. 1-08-0657

first degree murder (720 ILCS 5/8-4, 9-1(a)(1) (West 2002)) and three counts of aggravated battery (720 ILCS 5/12-4(a), (b)(1) (West 2002)).

1. First Fitness Hearing

On November 18, 2005, a fitness hearing was held to help determine defendant's fitness to stand trial. At that hearing, the parties stipulated that if called to testify Dr. Dawna Gutzman, an expert forensic clinical psychiatrist employed by the Forensic Clinical Services of the circuit court of Cook County, would testify that pursuant to a court order she examined defendant on October 20, 2005, solely in order to determine his fitness to stand trial, and concluded, to a reasonable degree of scientific certainty, that defendant was unable to stand trial, "due to acute symptoms of severe psychiatric disorders," *i.e.,* schizo-affective disorder, bipolar type. If called to testify, Dr. Gutzman would further state that it was her opinion that should defendant receive appropriate psychiatric treatment, *i.e.*, be placed in a secured psychiatric facility, he could be restored to fitness within the statutorily authorized period of one year.

The parties stipulated to Dr. Gutzman's entire report regarding defendant's fitness to stand trial. Although this report was prepared by Dr. Gutzman in her evaluation of defendant's fitness to stand trial, it was largely reiterated by Dr. Gutzman in her testimony at trial and was also relied upon by Dr. Nadkarni in rending his opinion on defendant's sanity in his testimony at defendant's trial. This report reveals that in determining whether defendant was fit to stand trial, Dr. Gutzman first reviewed numerous documents pertaining to defendant, including: (1) defendant's medication profile from Cermak Health Services, *i.e.*, the hospital of the Cook County jail (hereinafter referred as the "prison hospital"), where defendant was evaluated

3

immediately upon his arrest; (2) defendant's psychiatric records from Chicago Read Mental Health Center; (3) defendant's school transcripts; (4) defendant's psycho-social history report (including input from the defendant's family) prepared by a social worker employed by the Forensic Clinical Services of the circuit court; and (5) the police reports regarding the incident and leading up to the criminal charges brought against defendant.

These records reveal, as discussed in Dr. Gutzman's report, that defendant is 34 years old, that he was born in Iraq, but moved to the United States at an unidentified age, where he attended and graduated high school. The records further reveal that defendant has never worked because of his mental illness but, rather, receives disability checks.

Dr. Gutzman's report further reveals that in determining defendant's fitness to stand trial, she performed a 45-minute clinical evaluation of defendant. In her report, Dr. Gutzman noted that as of the date of that examination, defendant was being prescribed and was taking several psychotropic medications daily, including: 20 milligrams of Paxil once a day, 500 milligrams of Depakote twice a day, 30 milligrams of Navane twice a day, 10 milligrams of Zyprexa once a day; and 1 milligrams of Ativan three times a day.[2] Dr. Gutzman's reported that during the evaluation defendant appeared to be appropriately groomed, cooperative, maintaining appropriate eye contact during the interview. According to Dr. Gutzman's report, defendant's speech was of

---

[2]The record reveals that Paxil is an antidepressant, that Depakote is a mood stabilizer, often used in the treatment of the manic phase of bipolar disorders, as well as various types of seizures, that Navane and Zyprexa are anti-psychotic medications used in the treatment of schizophrenia, and that Ativan is an anti-anxiety medication.

normal rate and volume, and he exhibited no motor abnormalities except that his face "was masked." Defendant's mood was somewhat anxious and his affect constricted. Although defendant's thought processes were coherent and generally goal oriented, he had difficulty understanding or orienting to the passage of time. Moreover, although defendant's concentration was adequate, defendant exhibited impairment of his long-term memory. In her report, Dr. Gutzman further observed that although defendant's impulse control was intact, his reasoning was illogical, his judgment was impaired, and his insight was poor.

According to Dr. Gutzman's report, her evaluation of defendant, three months after his arrest, revealed that defendant could not appreciate the charges being brought against him. Specifically, Dr. Gutzman's report reveals that when asked what he was being charged with, defendant responded that he did not know. Defendant could further not state whether he was being charged with a felony or a misdemeanor, nor could he explain the difference between the two. When asked what he was accused of doing, however, defendant responded, "hitting someone with a knife." Defendant could not recall the date of the incident, but stated that he had been in jail "a couple of years," even though he had been incarcerated for only three months. When asked how he ended up in jail, defendant indicated, "I don't know, they picked me up, I guess." When asked to explain why he was picked up, defendant stated "because I stabbed him."

Dr. Gutzman's report further revealed that defendant could not understand the purpose of a trial or appreciate the role of different courtroom personnel. Specifically, Dr. Gutzman reported that when asked to explain the purpose of a trial, defendant first indicated that he did not know, but then on further prompting went on to state, "you go to [the] Supreme Court." Similarly,

5

defendant could not explain the meaning of the words evidence or testimony, but did describe a witness as "someone who watches you did something bad." Defendant could not explain the role of the State's Attorney at trial, but stated that a public defender's role is to "defend the person, the witness," and that the judge's role is "to see if something has been done wrong or right." When questioned about the meaning of the term "guilty," defendant stated that it means "someone that was in a crime picture." He stated that "guilty" means "someone who did a crime," and that "innocent" means "the person that didn't do the crime." Defendant further indicated that he did not know what would happen to him if he were found guilty or not guilty.

Dr. Gutzman's report also revealed that when asked to explain the meaning of the term "defendant," defendant stated "the person that I tried to lock up for 1000 years. Satan, he goes by the name Jason, but he is Satan." As shall be discussed in more detail in the context of Dr. Gutzman's testimony at defendant's trial, defendant then told Dr. Gutzman that for about two weeks prior to this incident, he had been receiving messages from Jesus telling him that he was "the Angel in human form on earth and that he should kill and lock up Satan for 1000 years." Defendant told Dr. Gutzman that he "tried to lock up [Satan] for 1000 years" so that Satan would not "deceive the nations," and that he tried to do so by hitting Satan with a knife, but that he ultimately did not succeed. Defendant stated that when he failed to lock up Satan, he went to his room, where he "wore the shirt that Jesus gave to [him]," a shirt that was given to him in 1993 "when [he] [w]as in Swedish Covenant Hospital." Defendant then changed course and told Dr. Gutzman that he wore that same shirt "before the fight" and that he did not know what he did once he returned to his room.

6

Dr. Gutzman's report also revealed that defendant told her that the victim was his neighbor, that he did not always know that Jason was Satan, but rather that "just instantly it came." Defendant explained that he knew that Jason was Satan because "he would talk things weird," "he smelled like Satan," and "he looked like Satan." When Dr. Gutzman asked defendant whether the arresting officers understood that Jason was Satan, he responded, "they didn't believe me."

During the clinical evaluation, defendant also told Dr. Gutzman that in the past he has received different types of messages from Jesus, *i.e.*, that he will be married soon. Defendant explained that he has heard "a big echo voice," instructing him "you gonna do this today, you gonna do that today," but that he is not certain whether this is Jesus speaking to him. When asked whether the voice tells him to hurt others or fight with them, defendant responded in the affirmative and explained that he has responded to these commands by fighting with others. When asked why he is supposed to fight, defendant responded, "for the Glory of God."

Dr. Gutzman's report further reveals that when questioned regarding any current symptoms of his mental illness, defendant complained of having great difficulty sleeping and feeling "down, depressed, worried and angry." Defendant also reported that he suffers from "anxiety, delusions, paranoias, schizophrenia, all of them coming together, they're squeezing my head." When asked to describe his delusions, defendant first indicated that he could not, but then stated, "I'm seeing Satan. All Satanic people, Satanic workers, they're all Demons."

With respect to defendant's past psychiatric and medical history, Dr. Gutzman's report reveals that when asked whether he has had a history of seizures or any concussions or head

7

injuries defendant stated, "they beat me up," and then explained that they referred to "Satan, Demons," and that the beating occurred two or three years ago. Defendant also stated that his mental health treatment began in 1989 and that he will "never forget that hellish day." Since then, he has been hospitalized between 17 to 25 times and has made two suicide attempts. The first suicide attempt occurred when defendant attempted to "pluck out [his] eye," in response to a Bible verse that commands, "if your eye causes you to sin, pluck it out and throw it away." The second occurred during one of his hospitalizations, when he took a very hot shower "so [his] brain [would] melt away, die fast."

Based on the aforementioned clinical evaluation of defendant, in her report, Dr. Gutzman concluded that defendant was unfit to stand trial as a result of his schizo-affective disorder, bipolar type. Based on this report, stipulated to by the parties at defendant's first fitness hearing, on November 18, 2005, the trial court found defendant unfit to stand trial and remanded him for treatment.

### 2. Second Fitness Hearing

One year later, on November 13, 2006, a second fitness hearing was held. At that hearing, Dr. Gutzman testified that pursuant to a court order she again examined defendant on October 19, 2006, to determine whether he was fit to stand trial, and that it was her opinion to a reasonable degree of scientific certainty that defendant was now fit while on medication.[3] We

---

[3]Later testimony by both Dr. Gutzman and Dr. Nadkarni revealed that in the one year between his first and second fitness hearings defendant was treated at Chester Mental Health Center where his medication was heavily adjusted so as to treat his psychosis and permit him to

note that, at this time, Dr. Gutzman also evaluated defendant to determine whether he was legally sane at the time of the commission of the offense and that she concluded to a reasonable degree of scientific certainty that he was legally insane. Dr. Gutzman did not testify with respect to this opinion at defendant's second fitness hearing.

During defendant's second fitness hearing, Dr. Gutzman testified that her opinion that defendant was fit to stand trial was based on a clinical interview that she performed on October 19, 2006, as well as her review of the following pertinent records: (1) her first clinical interview of defendant which took place on October 20, 2005; (2) defendant's medical records from the prison hospital, Chicago Read Mental Health Center, and Chester Medical Health Center; (3) defendant's high school and community college transcripts; (4) defendant's psycho-social history report; and (5) the police reports of the incident.

Dr. Gutzman specifically testified that defendant understood the charges against him, the pleas and penalties associated with his case, the nature of the proceedings, and the roles of different courtroom personnel. Defendant could also recall events and recount them, and was capable of behaving appropriately in the courtroom, as well as assisting his attorney in preparing his defense.

Dr. Gutzman also testified that defendant suffers from schizo-affective disorder, bipolar type, for which he is currently being treated with the following medication: (1) 125 milligrams of Clozapine[4] in the morning and 200 milligrams at bedtime; (2) 750 milligrams of Depakote twice

---

become fit to stand trial.

[4]Dr. Gutzman explained that Clozapine is an anti-psychotic medication, used to treat

daily; and (3) 20 milligrams of Paxil at bedtime. Dr. Gutzman averred that these medications would not interfere with defendant's fitness to stand trial.

Based on Dr. Gutzman's uncontradicted testimony, the trial court found defendant fit to stand trial with medication. Defendant subsequently waived his right to a jury and proceeded with a bench trial.

### 3. Bench Trial

At defendant's bench trial, defendant did not dispute his involvement in the commission of the facts with which he was charged. Rather, he raised the affirmative defense of insanity, contending that during the commission of the offense he was incapable of appreciating the criminality of his conduct.

### a. State's Case-in-Chief

In its case-in-chief, the State offered no psychiatric or other expert testimony. Instead, the State relied on four lay persons, including the victim, who witnessed the events prior to, during, and immediately following the crime.

The victim, Jason Burley, first testified that he is a 37-year-old commercial truck driver and that in July 2005, he lived with his grandmother and his parents, Jerome and Joanne Nelson, on the second floor of a six-unit apartment complex located at 5217 North Sawyer Avenue in Chicago. Burley acknowledged that defendant was his neighbor and that he lived on the first floor of the apartment complex with his family, but explained that prior to the incident, the two of them never had much contact, except for occasionally saying "Hello" to each other in the hallway.

symptoms such as delusions, hallucinations, and disorganized thoughts.

Burley then described the events that took place on July 23, 2005. He testified that at about 10 p.m. on that date, he was sitting on a manhole cover, on the common back stairwell of the building, smoking a cigarette, when he saw defendant walk out of the rear entrance, pass in front of him, and walk around the corner of the building. Burley averred that at this point, he was neither startled nor felt uncomfortable by defendant's presence, as he recognized defendant as his neighbor.

Burley testified, however, that only about 20 seconds later, he felt someone grab him around the neck from behind and that he saw a blade on the left side of his neck. Burley immediately grabbed the knife with his left hand to protect himself, slicing his left ring finger and leaving a superficial cut on the right side of his neck. Burley attempted to hold onto the knife, but his attacker came around to the front and stabbed him twice in the chest. Burley testified that it was only then that he actually recognized defendant as his attacker. Burley then grabbed defendant's wrists, raised them above defendant's head and pushed defendant backwards, forcing both of them to fall to the ground. After both men got up, Burley called for help and heard his mother shouting in response.

Burley observed defendant running toward the door to the stairwell, so he ran in the opposite direction toward the parking garage at the back of the building. Burley testified, however, that he then realized that his mother might try to come down the stairs to find out what was going on, and that she might run into defendant, so he quickly turned back. As he was running into the bottom door of the stairwell, Burley ran into his father, Jerome Nelson. Burley told his father what happened. Burley's mother came down the stairs a short while later, and after

11

hearing what happened, instructed Burley to come up the stairs. Burley could not walk up the stairs and therefore waited at the bottom of the stairwell for his mother to call an ambulance.

The police and the ambulance arrived soon thereafter and Burley was transported to Illinois Masonic Hospital. Burley testified that as a result of the attack he suffered the following injuries: (1) a superficial knife wound on his neck; (2) a severed left ring finger at the base; (3) a defensive wound on the interior part of his left elbow; (4) a wound on his chest, which collapsed his left lung and severed his right ventricle outflow track (which connects the right ventricle to the right atrium of the heart); and (5) a wound near his belly button. As a result of his injuries he underwent surgery and remained hospitalized for six days.

Burley also testified that immediately prior to and during the attack he never spoke to defendant, never threatened him in any way, nor said anything to defendant as defendant was walking out of the rear building entryway. In fact, Burley averred that prior to this incident he "never had any problems" with defendant at all.

Burley finally identified several photographs of the apartment complex where the incident occurred, a photograph of the area to which defendant ran following the attack and a photograph of the area to which Burley ran to get away from defendant. Burley also identified the knife used by defendant during the attack.

Defense counsel conducted no cross-examination of Burley, and the State called its next witness, Jerome Nelson. Nelson testified that in July 2005, he had been living with his wife, his mother-in-law, and his stepson, Jason Burley, at 5217 North Sawyer Avenue for about three years. Nelson acknowledged that he was familiar with defendant, who was their neighbor, and

who lived in the adjoining building with his family, but explained that prior to this incident, he never talked to defendant outside of a casual "Hello" in the hallway.

Nelson stated that at about 10:10 p.m. on July 23, 2005, he was sitting in the living room, when he heard his wife screaming for him because "something had happened" to their stepson, Burley. Nelson explained that minutes before that Burley had gone outside to smoke and his wife had proceeded to the kitchen. Nelson stated that after hearing his wife, he exited the apartment and ran down the building's back stairs to try and locate Burley. As he reached the first-floor landing, Nelson ran into defendant, who had blood on his clothes and was clutching a bag to his chest. When Nelson asked defendant what had happened, defendant responded, "Jason [Burley] stabbed me," and then proceeded to push Nelson out of the way so that he could enter his own apartment.

Nelson testified that he then turned around and observed Burley staggering through the rear entrance, holding his chest. Burley told Nelson that defendant stabbed him. Burley also told Nelson that as defendant stabbed him, defendant had yelled that "he [defendant] was Shiite."[5] While Burley's mother called 911, Nelson knocked on defendant's door, in an attempt to find out what happened. Although Nelson persisted in knocking, no one opened the door.

According to Nelson, soon thereafter, two police officers arrived at the scene and themselves proceeded to knock on the door. At this point, defendant and his mother opened the

---

[5]The record, as stipulated to by the parties, discloses that when defendant stabbed Burley, he was not in fact yelling or indicating that he was a "Shiite," but rather screaming the word, "Shira," which translates to "God."

13

door and stood in the doorway. Nelson testified that he heard the officers ask defendant to explain what had happened, and defendant respond, "he stabbed me." According to Nelson, the officers then entered defendant's apartment and proceeded to the kitchen. Once in the kitchen, the police officers asked defendant where the knife was, and Nelson observed defendant first point to a pantry room, and then lead the officer to the knife. Nelson stated that defendant then told the officers that he stabbed Burley because Burley had told him Jesus was black and Jesus then told defendant to stab or kill Burley. Defendant then began to ramble that Burley is the devil and Satan. Nelson testified that at this point, the paramedics arrived and that he therefore left the officers to be with his stepson.

On cross-examination, Nelson admitted that his testimony on direct examination that, immediately after the incident, Burley had said to him "he [the victim] stabbed me," was elicited for the first time at trial, two years after the occurrence. Burley admitted that he never told any of the officers at the scene of the crime that defendant had said that Burley stabbed him. Nelson further acknowledged that after the incident, he went to the police station, where he spoke to Lieutenant Carillo, and a female detective, but that he again failed to mention that defendant had said that Burley stabbed him. Instead, Nelson acknowledged that at that time he told police that defendant had said that Burley was a demon and that this was why defendant stabbed him

Officer Anil Hamid next testified that at approximately 10:15 p.m., on July 23, 2005, he responded to a call of a man being stabbed at 5217 North Sawyer Ave. Once at the scene, Officer Hamid went directly to the backyard, where he observed a man lying on the grass, bleeding from what appeared to be stab wounds. Officer Hamid soon learned that this was the victim, Jason

14

Burley. He also encountered the victim's mother and was directed to the first floor of the apartment building where the alleged offender lived. Together with Sergeant Eberlynn, Officer Hamid proceeded to the first-floor landing where he encountered Nelson. Officer Hamid knocked on defendant's door, which was immediately opened by defendant and his mother. Officer Hamid testified that defendant was "hysterical" and started shouting that "he [Burley] jumped on me; I stabbed him; he jumped on me."

Officer Hamid asked defendant where he put the knife, and defendant directed him to a pantry door, saying, "it's behind the door." From that pantry, Sergeant Eberlynn recovered a long kitchen knife which appeared to have blood on it. Defendant then stated that the victim was Satan and that he said that Jesus was black so defendant had to stab him.

Officer Hamid testified that defendant was then placed into custody and taken to the police station. He further identified photographs of defendant's front door and the pantry, as well as the knife that was recovered from the pantry.

Defense counsel conducted no cross-examination of the witness, and the State proceeded by way of a stipulation. The parties agreed that if called to testify, Detective Carillo would state that shortly after 10:15 p.m., on July 23, 2005, he responded to the scene of the incident at 5217 North Sawyer Ave. The parties agreed that Detective Carillo would testify that, together with Detective Delifant, he interviewed defendant at the police station soon after the incident. Specifically, Detective Carillo would state that at approximately 2:03 a.m. on July 24, 2005, in his presence, Detective Delifant advised defendant of his Miranda rights, and defendant verbally indicated that he understood those rights, wished to waive them and speak to the detectives.

According to Detective Carillo's stipulated testimony, during the interview, defendant told the detectives that three days prior to the incident, Jesus came to him in a dream and told him to kill the victim, who was Satan, in order to bring peace to the world. Defendant also told the officers that approximately 1 ½ weeks prior to the incident, the victim had told him that Jesus was black. Defendant further stated that after sporadically talking to the victim throughout the night, he removed a knife from the kitchen and walked out into the yard. He told detectives that he attacked the victim, stabbing him an unknown amount of times. Defendant also told the detectives that he felt that he had failed Jesus because he did not kill his neighbor. Defendant also stated that the victim did not have a weapon and had not attacked him.

It was further stipulated that Detective Carillo would testify that during the interview, defendant stated that as a result of the incident he wore shorts with stripes and a shirt which became bloody and which he removed so as not to scare his mother. The parties agreed that if called to testify, Detective Carillo would identify a photograph of defendant's bedroom, where the bloody clothing was found in plain view on the floor. He would explain that when he entered the apartment, defendant's mother pointed out defendant's medication and showed him defendant's room, where he found a pair of boxer shorts and a T-shirt that had red stains on it.

### b. Defendant's Case-in-Chief

After the State rested, the defense proceeded with its case-in-chief by calling two state-employed expert forensic psychiatrists, who both opined that defendant was legally insane at the time of the incident.

i. Dr. Gutzman

Dr. Gutzman, who was qualified as an expert in forensic psychiatry, testified that she is a forensic psychiatrist with Forensic Clinical Services of the circuit court of Cook County and that she has examined defendant twice pursuant to court orders: (1) the first time on October 20, 2005, three months after the stabbing, solely to determine defendant's fitness to stand trial and (2) the second time on October 19, 2006, in order to determine both defendant's fitness to stand trial, as well as his ability to appreciate the criminality of his conduct at the time of the offense.

Dr. Gutzman first testified with respect to her October 20, 2005, examination of defendant for purposes of determining his fitness to stand trial. She testified consistent with the report she prepared for the trial judge at defendant's first fitness hearing, which report, as already noted above, was stipulated to by the parties at that hearing and relied upon by the trial judge to initially find defendant unfit to stand trial. At trial Dr. Gutzman acknowledged that during this, her first, evaluation of defendant, only three months after his arrest, she made no diagnosis regarding defendant's sanity, since the focus was on his fitness to stand trial. However, she testified that certain details of that evaluation were relevant to defendant's state of mind at the time of the crime and established that defendant was "definitely psychotic" at the time of the incident.

Specifically, Dr. Gutzman testified that when first evaluating defendant on October 20, 2005, she spoke to defendant regarding the incident and defendant told her that he tried to "lock [Satan] up for 1000 years until Satan will be released from his prison so he won't deceive the nations no more." When asked whether he had been able to lock up Satan, defendant responded in the negative, explaining, "[w]e struggled. I fight it. I couldn't lock him up. I hit him with a

17

knife but I couldn't lock him up." When asked what he did after he hit Satan with a knife, defendant responded, "I went in my room and I wore the shirt that Jesus gave to me." Defendant explained that he received the shirt from Jesus in 1993, "when I [w]as in Swedish Covenant Hospital." When asked how he knew that the shirt was from Jesus, defendant responded, "because his hands were like this" and then proceeded to demonstrate by raising his arms out in front of him and allowing his hands to droop toward the floor. Immediately thereafter, without any prompting, defendant corrected himself, stating that in fact he "wore the shirt before the fight." When Dr. Gutzman then asked defendant to explain once again what he did after he went to his room, defendant responded that he did not know.

Dr. Gutzman proceeded to question defendant about his relationship with the victim. She first asked defendant when he realized that Jason was Satan, and defendant responded, "the last weeks of (pause) as soon as he would talk to me, he would talk things weird." Defendant further stated, "he smelled like Satan. He looked like Satan." When Dr. Gutzman repeated her question, asking defendant again when he actually realized Jason was Satan, defendant indicated that he could not recall. Dr. Gutzman inquired how long defendant had known the victim before he realized that he was Satan, and defendant responded, "he's my neighbor." Defendant then stated that he did not always know Jason was Satan but, rather, that "just instantly it came. I didn't realize it always." Defendant was also asked whether the arresting officers understood that Jason was Satan, and he responded, "they didn't believe me."

Dr. Gutzman also asked defendant when he decided that he needed to lock up Satan. Defendant responded "that day when I did that, I can't remember exactly." Defendant then told

18

Dr. Gutzman that he had been receiving messages from Jesus that he should lock Satan up, stating "Jesus would come up to me every night and say I love you, you are my son. You're going to kill Satan, You're going to lock him up for 1000 years so he won't go out deceiving the nations." Defendant continued to explain "I'm the Angel that came down from the sky to lock up Satan. I'm the angel but in a human form." When Dr. Gutzman asked defendant how long he had been receiving messages from Jesus to lock up Satan, defendant stated, "for about two weeks."

Dr. Gutzman next testified regarding her second clinical evaluation of defendant on October 19, 2006. She testified that the interview lasted approximately 25 minutes and that as a result of this interview she was of the opinion to a reasonable degree of scientific certainty that defendant was fit to stand trial while on medication, but that at the time of the commission of the offense he would have been legally insane, *i.e.*, unable to comprehend the criminality of his actions as a result of his schizo-affective disorder, bipolar type.

Dr. Gutzman described schizo-affective disorder as a chronic severe psychiatric disorder characterized by a person having psychotic symptoms such as delusions, hallucinations, disorganized thought processes, and bizarre behavior. She explained that patients with this disorder basically suffer all the same symptoms as patients with schizophrenia, as diagnosed by Dr. Nadkarni, but in addition suffer mood disturbances, *i.e.*, either depression (including symptoms such as sadness, inability to sleep, loss of appetite, etc.) or mania (including symptoms such as talkativeness, physical restlessness, racing of the mind, etc.) Dr. Gutzman stated that during her interview of defendant she personally observed defendant's delusional beliefs as well as

19

his disorganized thought processes and bizarre behavior. When questioned regarding the difference in the diagnosis she and Dr. Nadkarni had rendered, she explained that the issue was not relevant to defendant's sanity at the time of the offense, because both diagnoses were very severe psychotic disorders.

Dr. Gutzman further testified that in coming to her conclusion that defendant was legally insane at the time of the commission of the offense she reviewed, *inter alia*, voluminous medical records, which revealed that over the years, defendant required recurring psychiatric hospitalizations. According to Dr. Gutzman, these records revealed that defendant was first hospitalized in October 23, 1998, at Read Mental Health Center, after having experienced visual hallucinations (such as seeing angels beating on bad people and covering their mouths to keep them quiet), as well as auditory hallucinations (such as hearing voices coming from the computer and television, and Jesus telling him that he will make peace on earth for the next 1,000 years and Satan will be locked up in chains). The records further revealed that during his hospitalization at Read Mental Health Center defendant destroyed a television set because he felt that Satan was inside the electronic equipment.

Dr. Gutzman further testified that defendant was again admitted and treated at Read Mental Health Center on June 23, 1999, until his discharge on April 17, 1999. Defendant was admitted because he had failed to take his medication and struck a patient at Rush North Shore Hospital believing that she was Satan. The discharge summary from this hospitalization revealed a provisional diagnosis of paranoid schizophrenia and a discharge notice of schizo-affective disorder, manic type. Defendant was again admitted to Read Mental Health Center on May 22,

2000, after "being assaultive to his mother and brother," expressing paranoia and delusions about them being possessed by demons. After exhibiting aggressive behavior at Read Mental Health Center, including physically attacking peers because he believed that they were demons, defendant was transferred to a more secure facility, the Chester Mental Health Center, on July 22, 2000. After being stabilized, defendant was returned to Read Mental Health Center on February 6, 2002, and discharged about a month later on March 14, 2002. Defendant's discharge sheet indicated a diagnosis of chronic paranoid schizophrenia.

Dr. Gutzman stated that she also reviewed the medical records from the prison hospital where defendant was admitted immediately upon his arrest. These medical records stated a diagnosis of schizo-affective disorder and revealed the intake psychologist's notes stating, "patient appears to be paranoid and to have acted out on delusions." The records from the prison hospital further revealed that at the time of his admission, defendant told the psychologist that he saw "demons and Satan today," that he stabbed a person he believed was Satan and that he said, "I have delusions." When questioned what significance she would give to this last statement, Dr. Gutzman responded that she would have to make a conjecture as that statement is made outside of any context in the medical report. She stated that it was most likely that at that point defendant was being questioned about his mental illness and that, having been hospitalized multiple times, he was describing symptoms that he had heard from numerous doctors before.

Dr. Gutzman further averred that she also reviewed records from Chester Mental Health Center where defendant was hospitalized for a year after being found unfit to stand trial. While at Chester Mental Health Center, defendant was treated with Clozapine, Depakote and Paxil, and

had been stabilized so as not to exhibit or express any delusional beliefs. Dr. Gutzman concurred with Dr. Nadkarni that Clozapine is a potent drug "of last resort" used to treat delusions, hallucinations, disorganized thought process and bizarre behavior. She explained that Clozaril is a drug of last resort because although it is very effective in treating psychosis, it has potentially serious life-threatening side effects, *i.e.,* causing the bone marrow to stop producing blood cells, resulting in death. Consequently, any patient treated with Clozaril must have his blood drawn every two weeks to check the blood count, and the drug supplying company will not provide the hospital a dosage until the blood results are in. Dr. Gutzman explained that as a result of this procedure, there are times when defendant misses a dose, either because of a problem with obtaining the drug from the company or because of a court date, not because he is noncompliant. According to Dr. Gutzman, records from Chester Mental Health Center revealed that defendant had experienced the aforementioned difficulties with obtaining Clozaril, and that every time he missed a dose his behavior rapidly deteriorated, with defendant immediately beginning to exhibit symptoms of his psychosis, including heavy praying, and potentially becoming aggressive.

Dr. Gutzman also stated that she found no evidence that defendant had been malingering his symptoms. She specifically explained that in reviewing defendant's voluminous medical history, she encountered no report by any psychiatrist or psychologist indicating that defendant had been malingering.

Dr. Gutzman next testified that in coming to her conclusion that defendant was unable to appreciate the criminality of his actions, she also reviewed defendant's psycho-social history prepared by social worker Jean Bostcik. According to Dr. Gutzman, defendant's family informed

22

Bostick that defendant had a history of auditory and visual hallucinations and that at the time of the incident defendant had been seeing his psychiatrist, Dr. Reeves. Defendant's family also informed Bostick that two to three months prior to the incident Dr. Reeves had reduced defendant's medication and that they were concerned because lowering of the dosages had preceded defendant's prior hospitalizations at Read Mental Health Center.

Dr. Gutzman stated that she also reviewed the police reports of the incident, and opined that defendant made what she would consider "delusional statements" when he spoke to police. According to Dr. Gutzman, those statements were consistent, *i.e.*, very similar to or the same as those statements defendant had made many times in the past when he was ill, and which were documented as "hyper-religious delusions." Dr. Gutzman stated that she found nothing inconsistent in the fact that after stabbing the victim defendant took the knife with him back to his apartment. She explained that the fact that defendant did not attempt to discard the knife outside the apartment or otherwise conceal it explains that he did not think that he had done anything wrong. She elaborated that it was reasonable to presume that defendant was not trying to hide the knife when he put it inside the pantry because that would be a place where a knife would belong. Moreover, Dr. Gutzman stated that defendant never denied stabbing the victim because he believed that Jesus had given him the task of killing Satan and he believed that the victim was Satan and that he failed to kill him. Dr. Gutzman further averred that the fact that defendant changed his clothing right after the stabbing was consistent with his delusionally produced behavior and all part of one delusional episode. She stated that this was especially true in light of the fact that defendant admitted to police that he took his bloody clothing off, saying he did so

23

because he did not want to frighten his mother. Finally, Dr. Gutzman stated that there was nothing inconsistent in the fact that defendant locked himself in his apartment and refused to open the door to Nelson until the police arrived. She stated that although she cannot state exactly why a person who is psychotic would do something like that, "because it is hard for a sane person to interpret the behavior of a psychotic one," it is a fair assumption that defendant acted in such a way because he was still afraid of Satan, whom he had just encountered and struggled with.

Dr. Gutzman was next asked whether if she were told that, during the incident while stabbing the victim, defendant yelled out four to six times, "Shia, Shia, Shia," or "God, God, God," she would find that inconsistent with her determination that defendant was legally insane at the time of the commission of the offense, and she responded in the negative. Dr. Gutzman explained that if a patient believes he is on a mission from God, yelling out his name during the carrying out of that mission would be consistent with the delusion.

On cross-examination, Dr. Gutzman first admitted that she did not perform or order any tests for malingering on defendant, although she could have ordered a psychologist to perform such a test.

She further acknowledged that a person who has a mental illness could at the same time be legally sane at the time of an incident and that, in order to determine his sanity, it would be important to look at the particular date and time when the incident in question occurred. Dr. Gutzman then admitted that she never spoke to the victim, his family or the police officers involved in the manner. However, she explained that when evaluating the sanity of defendants, it is not standard practice, and she does not regularly interview either the victim or the police

24

officers involved in the incident. Dr. Gutzman further stated that, although in evaluating defendant she did attempt to obtain psychiatric records from Dr. Reeves, defendant's treating psychiatrist at the time of the commission of the offense, she never in fact received those records.

Dr. Gutzman also admitted on cross-examination that during her first interview of defendant, three months after the commission of the crime, her sole goal was to determine his fitness to stand trial, *i.e.*, his ability to understand the trial process, the charges against him, and the relevant roles of courtroom personnel, and that, accordingly, she did not further question defendant about the details of the incident more than already described during direct examination.

Dr. Gutzman similarly conceded that during her second interview of defendant about a year after the incident, defendant expressed remorse for what he had done and told her that "it was all delusions." Dr. Gutzman acknowledged that on this occasion, she did not ask defendant to describe any further the events of the incident than she already had done. Specifically, she never directly asked defendant why he locked the door after stabbing the victim or why he put the knife in the pantry.

Dr. Gutzman was next cross-examined about defendant's statement, "I stabbed him, he jumped on me," and denied that this was a statement of self-defense, stating that it was an explanation of the sequence of events. When questioned whether her opinion regarding defendant's ability to understand the criminality of his conduct would change if she had been aware that, prior to running into his apartment, defendant had bumped into Nelson and told him "Jason [the victim] stabbed me," Dr. Gutzman responded in the negative. She explained that in determining whether someone was legally sane during the commission of an offense it is

inappropriate to take one statement out of context; rather, one must look at the entire picture. She averred that any such statement by defendant would not be indicative of defendant's attempt to intentionally lie, especially since the police reports reveal that defendant interchangeably used "Jason" and "Satan" to refer to the victim. According to Dr. Gutzman, when saying "Jason stabbed me," defendant would have essentially been saying, "Satan stabbed me."

### ii. Dr. Nadkarni

Defendant's second expert witness, Dr. Nadkarni, was qualified as an expert in the field of forensic psychiatry and proceeded to testify that he is a staff forensic psychiatrist with the Forensic Clinical Services of the circuit court of Cook County and that, pursuant to a court order, he examined defendant on January 5, 2007, in order to render a second opinion as to defendant's sanity at the time of the offense. Dr. Nadkarni concluded to a reasonable degree of scientific certainty that at the time of the commission of the offense, defendant was legally insane, as he was suffering from an acute exacerbation of paranoid-type schizophrenia.

Dr. Nadkarni testified that in coming to this conclusion, he performed a clinical evaluation of defendant and reviewed voluminous records pertaining to defendant. These records included: (1) Dr. Gutzman's psychiatric evaluations, summaries and diagnosis of defendant performed on October 20, 2005, approximately 3 months after defendant's arrest, and on October 19, 2006, about 15 months after defendant's arrest; (2) defendant's social history prepared by social worker Janine Bostick of the Forensic Clinical Services on October 12, 2005; (3) extensive police reports and documentation pertaining to defendant's arrest; (4) defendant's prior criminal history; (5) defendant's statement to police given approximately five hours after the incident; (6) defendant's

educational record; (7) defendant's prior as well as current medication profiles and (8) defendant's medical records from Chester Mental Health Center dated 2006, from the prison hospital dated 2005, and from Chicago Read Mental Health Center for the period between 1998 to 2002.

Dr. Nadkarni testified that the aforementioned records revealed that defendant has a long history of chronic mental illness, beginning in 1989, when he was hospitalized in Ravenswood Hospital, after reporting "panic attacks *** [and] th[inking] [he] had a disease," and was treated with Trilafon, Desipramine and Xanax. Since then, defendant has been under the care of Dr. Robert Reeves, receiving ongoing psychiatric treatment on a biweekly basis. Defendant has been treated with a wide range of psychotropic medications, including Valium, Librium, Marplan, Seroquel, Risperdal, Zoloft, Prozac, Klonopin, Lithium and Tegretol. Dr. Nadkarni testified that the records further reveal that after his first episode at Ravenswood Hospital, defendant has required more than 20 inpatient psychiatric hospitalizations at such facilities as Rush North Shore, Swedish Covenant, Glen Oaks, St. Elizabeth and Illinois Masonic Hospitals. Defendant was also hospitalized at least seven times by the Illinois Department of Mental Health, at such facilities as Chicago Read Health Center and Chester Mental Health Center.

The records reviewed by Dr. Nadkarni further revealed that immediately upon his arrest in this case, defendant received a preliminary mental health screening by doctors at the prison hospital. These professionals noted that the patient "appears to be paranoid and having acted on delusion. Insight is fair; impulse control is poor; judgment is poor." According to Dr. Nadkarni, after the initial screening defendant was hospitalized in the inpatient psychiatric unit of the prison

hospital, where he was treated for an unspecified psychotic disorder versus schizo-affective disorder, which is a sczhiophrenic spectrum primary psychotic illness. During this time, defendant was reported as being

> "highly religiously preoccupied, unable to sit still and exhibiting psychomotor agitation and restlessness, which means he was pacing and was also highly emotionally charged. [Defendant] also was complaining of anxiety and experiencing hallucinations with Satanic themes."

Dr. Nadkarni explained that the records from the prison hospital further revealed that after "extensive treatment with psychotropic medications" for about one week, defendant was deemed stable enough to be discharged to the residential treatment unit of the hospital. However, due to an increase in disorganized thinking and behavior, about a month after his arrest, defendant again required admission to the inpatient psychiatric unit.

Dr. Nadkarni explained that the records that he reviewed revealed that between March 2006 and October 2006, defendant was hospitalized at Chester Mental Health Center, after the circuit court found him unfit to stand trial on the current charge due to "severe psychosis and assaultive behavior."

Dr. Nadkarni further testified that in determining defendant's sanity at the time of offense, apart from reviewing records, he also performed a clinical evaluation of defendant which lasted approximately 45 minutes. Dr. Nadkarni noted that defendant appeared to be older than his stated age, that his Department of Corrections (DOC) khaki uniform appeared somewhat sloppy and wrinkled, that he was mildly malodorous, and that his grooming and hygiene were fair.

Defendant was cooperative and maintained a pleasant and polite albeit somewhat anxious demeanor throughout the evaluation. According to Dr. Nadkarni, defendant's eye contact was largely fixed, intense and unblinking. He did not demonstrate psychomotor agitation or retardation, although he appeared somewhat restless, shifting position in his seat. Defendant's affect was constricted in range and intensity, tense-appearing, minimally reactive, but stable. His speech was somewhat rapid with mild pressure, machinelike and robotic but generally articulate. His thought process was goal directed, logical and linear. Defendant's thought content was free of current overt delusions, even though he admitted to continued intermittent referential and religious ideations, but stated "but I'm not scared anymore." Based on defendant's fund of knowledge and rapidity of responses, Dr. Nadkarni estimated his intelligence to be at least above average.

Dr. Nadkarni testified that at the time of his clinical interview with defendant, defendant was being treated with Paxil, Depakote and Clozaril. He explained that Clozaril is a potent antipsychotic medication that is used as a fourth or fifth line of medication because it involves extensive patient monitoring. Dr. Nadkarni opined that patients who are given Clozaril are generally individuals who are responding either poorly to other psychotropic medications and/or their illness is so severe that they need "what essentially amounts to a heavy gun type of medication."

Dr. Nadkarni next testified about the substance of his clinical interview with defendant. He stated that he began his evaluation by asking defendant to provide him with his own account of the events leading up to his arrest on July 23, 2005. Defendant told Dr. Nadkarni that he was

"phasing out" his Zyprexa medication because he had heard that Zyprexa causes diabetes and pancreatitis. Defendant reported that he had been under the care of Dr. Robert Reeves, his outpatient psychiatrist located at Sheridan and Foster Avenues, and that he had been seeing Dr. Reeves for many years due to "schizophrenic, delusion, paranoia, anxiety." Defendant reported that he ceased taking Zyprexa approximately one to two months prior to the incident on advice of Dr. Reeves who recommended that defendant switch to Abilify, another antipsychotic medication. Defendant told Dr. Nadkarni that he took Abilify, as well as Navane (a mood stabilizer) and Depakote (an antidepressant) regularly as prescribed and that he was compliant with such treatment on the day of the incident.

Dr. Nadkarni testified that defendant's statement about switching medication was corroborated by defendant's family, who told the Forensic Clinical Services' social worker that they expressed concern to defendant's psychiatrist after defendant was given Abilify, instead of Zyprexa, because they noticed that defendant was again becoming more religiously preoccupied and out of touch with reality, and they were concerned about his mental state.

Referring to his notes of the interview with defendant, Dr. Nadkarni next testified that defendant related the following version of events describing the incident:

"I had a friend of mine. We were smoking cigarettes. He went back home. That day I gave him a ride back. I seen, Jason, the victim. I looked at his teeth. I saw a gap. I thought he was Satan, like Madonna. God was telling me to echo I was an angel come from the sky. I had keys to the abyss. I could lock him up. I wanted to lock him up with my shoe laces that Jesus gave me. Jason was sitting on a sewer. I wanted to hold him

30

from the back, stick him by the neck.  He grabbed my hand.  I fall down.  I cut my elbow. We were fighting for the knife.  He pulls it toward him.  I got nervous.  I failed the mission and God would punish me.  He was Satan.  When he would ask me when he would find a righteous girl and say that Jesus is black, I would lock him up for a thousand years.  I go to my room.  I cry because I didn't lock up Satan.  My mother was crying. My brother was sad.  The police were coming.  I heard the sirens.  They come.  They ask for the knife.  I gave them the kitchen knife.  They arrested me."

When asked whether he had been experiencing any unusual mental phenomena around the time of the incident defendant stated he felt depressed, and that for several months he had been "crying myself to sleep," that he was hyperphagic, feeling worthless and useless and having guilty ruminations.  Defendant also reported that he was experiencing auditory hallucinations during increasingly intense prayer at night and that he heard the voice of God saying, "do it, lock him up."  Defendant told Dr. Nadkarni that he was experiencing what Dr. Nadkarni identified as referential and paranoid delusions of a highly religious nature, specifically reporting that he felt the television set was telling him to "fight Satan."

Defendant denied experiencing any manic symptoms or suicidal ideation at the time of the incident, or having any overt homicidal ideation except in context of the delusional preoccupation. However, defendant reported two prior suicide attempts: (1) at Glenn Oaks Hospital, where he attempted to "explode [his] brain" by sitting under a hot shower because he "thought [he] was the Antichrist," and (2) on a different occasion when he attempted to pluck his eye out in response to a biblical passage.  Defendant denied the use of drugs or alcohol during the time of the incident.

When questioned about his mental illness, defendant reported a long history of auditory hallucinations of "echoes of religious figures" accompanied by severe hyper-religious preoccupation and delusional ideation, "praying a lot," as well as paranoia. Defendant also reported hearing voices from the television and radio. He stated that his psychosis improves, however, "once [he] take[s] [his] meds." When questioned about his mood, defendant provided what Dr. Nadkarni classified as a history of manic episodes lasting several days, manifested by feeling "up and being popular," with grandiose thoughts, jumbled and rapid speech and thought process, and little need for sleep, followed by several major depressive episodes, manifested by severe tearfulness and isolation, the feelings of worthlessness and guilt, hopelessness and severely decreased concentration.

Based on the aforementioned records and clinical interview, Dr. Nadkarni diagnosed defendant with schizophrenic chronic paranoid-type disorder and opined that as a result of his illness at the time of the incident defendant was highly religiously preoccupied and psychotic, so as not to be able to appreciate the criminality of his conduct.

Dr. Nadkarni testified that his conclusion is supported by the voluminous records he reviewed prior to interviewing defendant, including police reports, defendant's social history and medical records. Specifically, Dr. Nadkarni first testified that the police reports of the incident and arrest supported the conclusion that defendant was legally insane at the time of the crime. Dr. Nadkarni explained that he reviewed the police documentation "very carefully" because one of the criteria that is relevant in determining whether a patient truly suffers from a delusion at the time of the commission of the crime is the consistency of the story that he provides to multiple

examiners or the police. According to Dr. Nadkarni, the police reports revealed that when the police arrived, Nelson informed them that he heard the offender state that the victim said Jesus was black and that the victim was a demon so defendant stabbed him and had to kill him. Dr. Nadkarni further stated that the reports revealed that in his statement to police defendant had said that: (1) "Jesus told him in a dream three days ago to kill the victim who is Satan in order to bring peace to the world"; (2) the victim had told defendant Jesus was black approximately 1 to 1 ½ weeks before the incident; (3) defendant felt that he had failed Jesus because he did not kill his neighbor; (4) defendant stated that his shirt had blood on it so he hid it so as not to scare his mother; and (5) defendant stated he wore shorts with stripes. According to Dr. Nadkarni the aforementioned police reports were consistent with and supported his conclusion that defendant suffers from a diagnosable primary psychotic mental illness that was "active at the time of the alleged incident," so as to prohibit defendant from being able to appreciate the criminality of his conduct.

Dr. Nadkarni also testified that from his interview with defendant, he could not detect any malingering, *i.e.,* feigning or exaggerating symptoms, on the part of defendant. He further testified that in all of the reports he reviewed, defendant has never been diagnosed with malingering his symptoms.

Dr. Nadkarni testified that in coming to his conclusion that defendant was legally insane at the time of the incident, he also considered information provided by defendant's family in the social history compiled by the Forensic Clinical Services' social worker, as well as medical reports, which both revealed a pattern in defendant's psychosis. The family reported that

defendant's psychosis exhibits as hyper-religiosity, namely, that on such occasions defendant increases the amount, frequency and intensity of his praying and that he becomes very preoccupied with religion and with matters of God and Satan. The family explained that on such occasions, defendant talks about God and Satan and appears to be internally stimulated by them. The family also reported that defendant experienced auditory and visual hallucinations with religious themes, including Jesus, as well as that he exhibited grandiose or self-inflated or elevated delusion of being an angel or a special messenger of God.

According to Dr. Nadkarni this is corroborated by numerous inpatient hospital records that reveal that when defendant becomes ill, he becomes very religious, starts to pray a lot and to develop delusions about people being Satan, and about him being sent to either cleanse the world or some variation of that theme. For example, during several of his hospitalizations at Chicago Read Mental Health Center between 1998 and 2002, defendant has exhibited hyper-religious delusions and auditory and visual hallucinations of a religious type, as well as "impulsive, paranoid, [and] unpredictable" behavior. The records from Read Mental Health Center further reveal that when he becomes acutely ill, defendant exhibits pressured speech and destroys or attempts to destroy electronic equipment, including television sets, radios, and computers due to auditory hallucinations, *i.e.*, voices he hears coming from that equipment.

Dr. Nadkarni also noted that the medical records reveal that when defendant becomes ill, *i.e.*, succumbs to one of his religious delusions, he becomes combative and violent. Specifically, the prison hospital records documented several unprovoked attacks which necessitated defendant's remand to Chester Mental Health Center. Defendant's medical records similarly

34

reveal that between 2000 and 2002, defendant required virtually continuous inpatient treatment through the Department of Mental Health due to his combativeness brought on by his severe psychotic illness, exhibited with preoccupation with religious themes. Another similar report from Chicago Read Health Center in 1999 revealed that defendant was transferred to that center because he threatened to punch another patient, believing that she was Satan. That same report revealed that although after treatment defendant no longer believed that the other patient was Satan, he also felt that he did not need to be in the hospital and wanted to leave as soon as possible.

On cross-examination, Dr. Nadkarni acknowledged that his expert psychiatric diagnosis differs from the diagnosis made by Dr. Gutzman, who diagnosed defendant with schizo-affective disorder, bipolar type.

Dr. Nadkarni further acknowledged that defendant's sanity at the time of the commission of the offense is a legal question and that to answer this question it is crucial to look at the events which occurred on July 23, 2005. Dr. Nadkarni then acknowledged that he first interviewed defendant a year and a half after the stabbing and that he never spoke to defendant prior to this time. Dr. Nadkarni admitted that in coming to his conclusion he never interviewed any of the witnesses or police officers involved in the case but rather relied, in large part, on the police reports describing the incident.

When questioned about the substance of these police reports, Dr. Nadkarni admitted that he was not aware that: (1) upon running into Nelson on the stairs, defendant told Nelson that the victim had stabbed him, and (2) that Nelson later went to defendant's apartment and pounded on

defendant's door but to no avail. Dr. Nadkarni stated that after defendant gave him a narrative of the events he did not question defendant about the details of that night.

Dr. Nadkarni further testified that he was aware that when defendant came into his apartment he took off the bloody clothes that he was wearing and that the police later recovered those clothes from the floor of defendant's bedroom. Although Dr. Nadkarni could not specifically recall precisely where defendant had placed the knife (although other testimony at trial revealed that it was undisputed that the knife was placed in the kitchen pantry), he did recall from the police reports that defendant gave that knife to police on his own. When asked if he would change his opinion regarding defendant's ability to understand the criminality of his actions if he were told that it was the police who retrieved the knife by themselves, rather than defendant who had given it to them, Dr. Nadkarni responded in the negative.

Dr. Nadkarni also testified that he was aware from reading the police reports that when the police first arrived, defendant initially said, "I stabbed him; he jumped me." When asked whether this statement could be interpreted as a self-defense-type statement, Dr. Nadkarni responded that it was possible but improbable in this case that this was a self-serving statement. He explaining that was more likely a response from the "mind of someone who is psychotic."

Dr. Nadkarni was also cross-examined regarding the factors that he looked to in determining whether defendant's accounts to him were actually true. Dr. Nadkarni indicated that one of the factors he considered was whether there was a consistency between what defendant told him and what he said to others. He acknowledged that the following information in defendant's narrative to him regarding the incident was not in any of the police reports or

defendant's statement to police: (1) defendant looked into the victim's teeth and thought that the gap in his teeth meant that he was Satan, like Madonna; (2) defendant was an angel come from the sky and that he had the "keys to the abyss"; (3) defendant wanted to lock up the victim with shoelaces given to him by Jesus; (4) the victim's questions to defendant when the victim would be able to find a righteous girl; (5) defendant's statement that he would "lock [the victim] up for a thousand years"; and (6) defendant started to cry because he felt he failed his mission to God.

On cross-examination, Dr. Nadkarni also acknowledged that although there are exams that can be used to test for malingering, he never performed or ordered them. Dr. Nadkarni explained, however, that there was no need for such tests, since defendant's undisputed medical history going back over 15 years revealed defendant's psychosis and symptoms, which symptoms were confirmed in the prison hospital on the day of defendant's arrest, and which symptoms in defendant's entire 15 years of treatment and hospitalization never gave rise to suspicion of being malingered.

Dr. Nadkarni next conceded that a person who is truly experiencing a delusion would believe that it was true and part of his reality, and would therefore not call it a "delusion." He also acknowledged that when defendant was initially admitted to the prison hospital upon his arrest, he told intake workers "I have delusions" and stated he wanted to go to Chester Mental Health Center because "it is nice there."

Although on cross-examination Dr. Nadkarni also acknowledged that he never spoke to defendant's family but instead relied on defendant's psycho-social history prepared by Joanne Bostick, a social worker of the Forensic Clinical Services, he explained that it was standard

practice in the Forensic Clinical Services that the social worker, rather than a psychiatrist interview defendant's family. Dr. Nadkarni testified that defendant's family reported to Bostick that defendant had done very well on the previously mentioned psychotropic medication until his dosages were lowered approximately two to three months prior to his arrest and that defendant's family then contacted his psychiatrist, Dr. Reeves, to ask him to change the medication levels, but to no avail. Dr. Nadkarni admitted that although the family expressly indicated that for detailed information regarding defendant's treatment, his psychiatrist, Dr. Reeves, should be contacted directly, he never contacted Dr. Reeves or obtained any of his psychiatric notes or records.

Dr. Nadkarni was next cross-examined about the reliability of defendant's family's statements to Bostick. Dr. Nadkarni acknowledged that although defendant's family adamantly denied ever being afraid of him and reported that defendant had no prior history of destruction to household property, several medical records contradicted their statements. Specifically, Dr. Nadkarni acknowledged that defendant was once hospitalized at Read Mental Health Center after being caught by his mother and sister with a knife, admitting that he had wanted to stab his brother-in law because he believed his brother-in-law was Satan. Records from Read Mental Health Center also reveal that on another occasion defendant poured water into a television and destroyed it, complaining of voices coming from the televison set. When asked to comment on the discrepancy between the family's statements and the medical records, however, Dr. Nadkarni explained that it was not uncommon for family members to minimize a patient's mental history or guard a chronic mentally ill family member because of the stigma attached to mental illness.

On redirect examination, Dr. Nadkarni was given a copy of the police reports in order to

refresh his memory and testified that when making his opinion regarding defendant's sanity he had been aware of the fact that Nelson had pounded on defendant's door prior to the arrival of the police but that the door remained unopened, but that he simply could not recall it on cross-examination without the benefit of that report. Dr. Nadkarni further testified that his opinion regarding defendant's ability to comprehend the criminality of his actions at the time of the incident would not change if he were told that defendant initially told Nelson that it was the victim who stabbed him, rather than the other way around. Dr. Nadkarni explained that in every case there are going to be small inconsistencies, and that even in a highly psychotic individuals there can be "attempts made at self-defense or other strategies." He reiterated that it was evident to him from both his interview with defendant and the voluminous records he reviewed that defendant was substantially impaired due to active acute psychosis so as not be able to appreciate the criminality of the alleged act. Dr. Nadkarni repeated that it was highly relevant that upon his arrest and placement at the prison hospital defendant was immediately prescribed medication to stabilize his psychosis and it took a week before he could be transferred to the general residential unit. Dr. Nadkarni further explained that it took defendant seven months and heavy antipsychotic medication, including Clozaril, to restore him to fitness to stand trial.

Dr. Nadkarni further testified on redirect that the medical records and the police reports were consistent with defendant's statement to him because they revealed the same "psychotic theme," *i.e.*, the delusions, the psychosis, the being out of touch with reality, the disorganization of thought. He explained that consistency in reports and defendant's actions does not necessarily mean that every document and statement will be identical.

When asked again to explain why he did not perform or order any tests to determine whether defendant was malingering his symptoms, on redirect, Dr. Nadkarni stated that he was convinced that there was no need for such tests because all of the collateral information, including the police reports and the substantial documentation of defendant's mental illness corroborated defendant's symptoms, so that malingering was not an option. He further added that had he had any suspicion whatsoever of malingering he certainly would have referred defendant to a psychologist within the Forensic Clinical Services for such testing.

### iii. Stipulations

The defense next proceeded by way of two stipulations. First, the parties agreed that if called to testify, the victim would state that while defendant was attacking him, defendant yelled out four of five times something that sounded like "Shia," but that when he spoke to defendant's mother shortly after the stabbing she explained to him that the word "Shira" means "God." If called to testify, the victim would also state that defendant did not speak to him prior to or after the stabbing.

The second stipulation by the defense indicated that the parties agreed that if called to testify Detective Carillo would state that on the morning of July 24, 2005, he talked to the victim at the hospital and that the victim recounted the following facts regarding the incident: The victim was sitting in the backyard while defendant kept going in and out of the building. While the victim sat in the yard by himself, he saw out of the corner of his eye defendant approach him from behind and reach around him, holding a shiny object. The object was a knife and defendant placed it by the victim's throat. The victim grabbed defendant and wrestled him to the ground.

40

As they wrestled defendant stabbed at the victim several times, causing the injuries to the victim.

### c. Verdict and Posttrial proceedings

After hearing closing arguments, the trial judge found that at the time of the offense, defendant was capable of appreciating the criminality of his actions and that, therefore, he was guilty but mentally ill of one count of attempted murder and three counts of aggravated battery. The trial judge subsequently denied defendant's motion for a new trial and sentenced defendant to 15 years' imprisonment, a sentence 9 years above the statutory minimum.[6] Defendant now appeals.

### III. ANALYSIS

Defendant first contends that the trial court erred in finding him guilty but mentally ill rather than legally insane. Under section 6-2(a) of the Criminal Code of 1961 (hereinafter Criminal Code), "[a] person is not criminally responsible for conduct if, at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2004).[7] On the other hand, "[a] person

---

[6]As noted above, the statutory range for attempted murder is a prison term of not less than 6 years and not more than 30 years. See 720 ILCS 5/8-4(c)(1) (West 2002) (attempt first degree murder is sentenced as a Class X felony); see also 730 ILCS 5/5-8-1(a)(3) (West 2002) (sentence for Class X felony is 6 to 30 years' imprisonment)).

[7]We note that under the previous insanity statute a person could also be found not criminally responsible for his conduct, where as a result of his mental disease or defect, he "was unable to conform to the requirements of law." 720 ILCS 5/6-2(a) (West 1992). This language,

who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill." 720 ILCS 5/6-2(c) (West 2004); see also 725 ILCS 5/115-3(c) (West 2002).[8]

The defense of insanity is an affirmative one, which defendant bears the burden of proving by clear and convincing evidence. 720 ILCS 5/6-2(e) (West 2004).[9] However, the State retains

---

however, was deleted in the current version of the statute. See Pub. Act 89-404, eff. August 20, 1995.

[8]We note that section 115-3(c) of the Code of Criminal Procedure of 1963 states in pertinent part:

"When the defendant has asserted a defense of insanity, the court may find the defendant guilty but mentally ill if, after hearing all of the evidence, the court finds that:

(1) the State has proven beyond a reasonable doubt that the defendant is guilty of the offense charged; and

(2) the defendant has failed to prove his insanity as required in subsection (b) of Section 3-2 of the Criminal Code of 1961, as amended, and subsections (a), (b) and (e) of Section 6-2 of the Criminal Code of 1961, as amended; and

(3) the defendant has proven by a preponderance of the evidence that he was mentally ill, as defined in subsections (c) and (d) of Section 6-2 of the Criminal Code of 1961, as amended, at the time of the offense." 725 ILCS 5/115-3(c) (West 2002).

[9]Again, we note that under the previous version of the insanity statute a defendant was

the burden of proving defendant guilty of the charged offense beyond a reasonable doubt. See 720 ILCS 5/6-2(e) (West 2004) ("When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by clear and convincing evidence that the defendant is not guilty by reason of insanity. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of each of the offenses charged, and, in a jury trial where the insanity defense has been presented, the jury must be instructed that it may not consider whether the defendant has met his burden of proving that he is not guilty by reason of insanity until and unless it has first determined that the State has proven the defendant guilty beyond a reasonable doubt of the offense with which he is charged"). The questions of defendant's sanity and mental illness are questions of fact, and the fact finder's determination on these issues will not be disturbed unless contrary to the manifest weight of the evidence. People v. Urdiales, 225 Ill. 2d 354, 428, 871 N.E.2d 669 (2007), citing People v. Johnson, 146 Ill. 2d 109, 128-29, 585 N.E.2d 78 (1991).

In the present case, the trial judge found that defendant's actions on the date of the incident were "quite contrary" to his assertion that he was insane at the time of the event. The trial judge stated that in coming to her conclusion she considered four factors occurring in the aftermath of the incident. First, the judge attributed to defendant an attempt to shift the blame onto the victim on three separate occasions, each of which will be discussed in detail below.

---

held to a lesser burden of proof by a preponderance of the evidence, but that under the current statute, that standard was raised to "clear and convincing evidence." See Pub. Act 89-404, eff. August 20, 1995..

Second, the judge asserted that defendnat must have been aware of the criminality of his conduct because he "hid the weapon in the pantry." Third, the judge asserted that defendant "did not tell his mother what happened, although he was close to her." Finally, the judge stated that defendant must have been sane at the time of the incident because after the stabbing he "took off his bloody clothes and hid it."

The judge reasoned that if in fact defendant had been under the delusion that God told him to stab the victim he would have no reason for putting blame on another person, for hiding the knife or for hiding his clothing. The judge further stated:

"If [defendant] was under the delusion that he was carrying out this service for God, that he should have-- you would expect it to be consistent with that he would tell his mother he did this act for God. He would tell the police officers, that he would tell the stepfather/father of the complaining witness if this was what he truly believed."

The trial judge instead found that defendant must have been malingering because upon his arrest he told medical personnel at the prison hospital that "he was delusional." As the judge stated:

"If someone is delusional they wouldn't know that they were delusional. So to not be malingering, to actually be experiencing delusions, one would not know that. They would be believing what is happening to them to be reality. So I find it ironic that defendant will be will be telling medical personnel that he's having delusions. It's just contrary to what a delusion is."

With respect to the testimony of the two expert witnesses, the trial judge found that the

44

experts failed to establish by clear and convincing evidence that defendant was insane at the time of the commission of the offense. Specifically, she found the testimony of both experts lacked credibility. With respect to Dr. Gutzman, the trial judge noted that she gave no credence to Dr. Gutzman's opinion that defendant could not have been malingering, because although there were tests that were available Dr. Gutzman to test for malingering, the doctor "chose" not to perform or order any of them. The trial judge also noted that a few times on cross-examination, Dr. Gutzman conceded that she was just "assuming things." The trial judge similarly dismissed Dr. Nadkarni's opinion asserting that she found "shocking" that Dr. Nadkarni "did not go over the events in the police reports" and that he "did not know about certain statements that were in those police reports."

Defendant urges that the trial court's decision was against the manifest weight of the evidence. Defendant points to the fact that two psychiatrists, who were appointed by the court, testified that defendant was insane at the time of the crime, that the opinions of these two experts are amply supported by the lay testimony as well as the relevant police reports, defendant's social history and medical records, and that the Sate produced no expert testimony to the contrary. In response, the State argues that the trial court was within its province as the trier of fact to reject all of the expert testimony and rest its finding that defendant was not insane solely on the lay testimony presented at trial. For the reasons discussed below, we agree with defendant that the decision of the trial court was against the manifest weight of the evidence.

It is undisputed that the State need not present expert testimony on the issue of defendant's sanity, but may rely purely on facts in evidence and the inferences that follow from

those facts. People v. McCullum, 386 Ill. App. 3d 495, 504-05, 897 N.E.2d 787, 796 (2008) ("Expert testimony may be entirely rejected by the trier of fact if he or she concludes a defendant was sane based on factors such as: whether lay testimony is based on observations made shortly before or after the crime; the existence of a plan for the crime; and methods undertaken by the defendant to prevent detection"); see also People v. Baker, 253 Ill. App. 3d 15, 28, 625 N.E.2d 719, 727 (1993); People v. Camden, 219 Ill. App. 3d 124, 134, 578 N.E.2d 1211 (1991) ("The trier of fact may determine the issue of sanity solely on the basis of the opinion of lay witnesses if such opinions are based on personal observations of the defendant"); see also People v. Cox, 377 Ill. App. 3d 690, 697, 879 N.E.2d 459 (2007) (holding that "the function of the trier of fact to assess the credibility of witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence").

However, the relative weight to be given an expert witness's opinion on sanity, however, cannot be arbitrarily made but rather must be determined by "the reasons given and the facts supporting the opinion." McCullum, 386 Ill. App. 3d at 504, 897 N.E.2d at 796; see also Baker, 253 Ill. App. 3d at 27-28, 625 N.E.2d at 727; see also People v. Wilhoite, 228 Ill. App. 3d 12, 20-21, 592 N.E.2d 48 (1991). Accordingly, "[w]hile it is within the province of the trier of fact as the judge of the witness' credibility to reject or give little weight to *** expert psychiatric testimony, this power is not an unbridled one" (Baker, 253 Ill. App. 3d at 30, 625 N.E.2d at 727), and a trial court may not simply draw different conclusions from the testimony of an otherwise credible and unimpeached expert witness (People v. Arndt, 86 Ill. App. 3d 744, 750, 408 N.E.2d 757, 761 (1980)).

No. 1-08-0657

We begin by noting that it is undisputed in this case that the incident for which defendant was charged was conceived and took place in the grip of a psychotic delusion. No one suggested an alternative motive for defendant's attack other than to eliminate Satan pursuant to a commandment from God. No one suggested or imputed any other design or motive to explain defendant's actions other than his delusion, namely, that the victim was Satan, whom he was determined to kill or incarcerate for 1,000 years. Accordingly, defendant's ability to appreciate the criminality of his conduct must be viewed from the perspective of this delusion, that whatever he did was to implement a divine command to attack the victim whom he envisioned as a demon or Satan. Thus, from the outset there is no reason to think that defendant in carrying out this command would necessarily know that his divine commission of destroying a demon or Satan would be unlawful. And it is from this perspective that we must review the expert testimony given on behalf of defendant and the four factors upon which the trial judge relied in rejecting the testimony of those experts.

We begin by noting that the testimony of the two state-appointed expert psychiatrists regarding defendant's sanity at the time of the offense established by clear and convincing evidence that defendant could not have appreciated the criminality of his conduct while under such a delusion. Drs. Gutzman and Nadkarni both unequivocally testified that after interviewing defendant and reviewing voluminous records of his prior mental health history, as well as the police reports of the incident, it was their opinion, to a reasonable degree of scientific certainty, that at the time of the offense, defendant was under a hyper-religious delusion caused by his mental illness, which would have substantially impaired his ability to comprehend the

47

wrongfulness of his actions.

While, as already noted above, a trial court is free to reject expert opinion testimony, we can see no basis for doing so in this case. This is not a case where there is substantial disagreement among the testifying experts. See Baker, 253 Ill. App. 3d at 28, 625 N.E.2d at 727, citing People v. Williams, 201 Ill. App. 3d 207, 216-17, 558 N.E.2d 1258 (1990). Although the two experts disagreed about the specific diagnoses of defendant (with Dr. Nadkarni diagnosing defendant with schizophrenic chronic paranoid type disorder, and Dr. Gutzman diagnosing him with schizo-affective disorder, bipolar type), there was ample testimony presented at trial that this difference was purely an academic one and that it had no relevance in determining defendant's sanity at the time of the offense. In fact, Dr. Gutzman specifically testified that the difference in diagnosis "would have no bearing on the issue of sanity as both diagnosis are very severe psychotic disorders."

Moreover, contrary to the State's assertion, and the trial court's findings below, this is also not a case where the experts' opinions suffer from a failure to consider relevant authorities or information concerning the defendant or ignore information which was contrary to their opinions. See Baker, 253 Ill. App. 3d at 28, 625 N.E.2d at 727, citing Williams, 201 Ill. App. 3d at 218, 558 N.E.2d at 1265, and People v. Jackson, 170 Ill. App.3d 77, 522 N.E.2d 577 (1987). Both Dr. Nadkarni and Dr. Gutzman testified that in coming to their conclusions, they thoroughly reviewed all the available information on defendant's condition, as well as the police reports regarding the incident. The credibility of both experts was further bolstered by the fact that both were employed by the Forensic Clinical Services of the circuit court of Cook County, and

therefore examined defendant pursuant to court orders. Neither expert was hired by defendant to examine him and then provide an opinion at trial. See Baker, 253 Ill. App. 3d at 28, 625 N.E.2d at 727 (holding that in determining the credibility of an expert witness it was relevant that the witness was a State employed psychiatrist, who was appointed by the circuit court to examine defendant, rather than a paid expert offering an opinion solely for purposes of the trial).

Both experts extensively reviewed defendant's voluminous medical records which reveal that defendant first exhibited symptoms of his mental illness in 1989 and that he has essentially been suffering from some form of schizophrenic disorder for over 16 years prior to the stabbing. The records further reveal that although defendant has an overseeing psychiatrist and has been treated with heavy combinations of anti-psychotic medication, over the years, he has nevertheless required more than 27 psychiatric hospitalizations. Many of the psychological problems and symptoms defendant displayed before, during and after the stabbing of the victim were also displayed during these earlier hospitalizations, including that: (1) defendant was experiencing hyper-religious delusions, (2) that he was hysterical, violent and combative, attacking different individuals at different times because he believed that they were Satan or demons and that he was sent by God to cleanse the earth of them, and (3) that he did not appreciate that he was ill. Moreover, defendant's initial diagnosis, as well as his continued diagnosis for treatment in the following 16 years was obtained in the ordinary course of treatment and could not have been procured with the intent of gaining any legal benefit. Therefore, defendant's previous mental health history strongly supports the experts' opinions, particularly since the testimony at trial was undisputed that this type of mental illness (be it schizophrenic chronic paranoid-type disorder, or

schizo-affective disorder, bipolar type) is chronic, "even though [it] will not necessarily permeate the entire gamut of a patient's behavior at all times." Baker, 253 Ill. App. 3d at 29, 625 N.E.2d at 728, citing People v. Palmer, 139 Ill. App. 3d 966, 974, 487 N.E.2d 1154 (1985) (appellate court reversed the trial court's finding of guilty but mentally ill in light of defendant's history of mental illness including his prior psychiatric hospitalization, his failure to plan or attempt to conceal the crime, the lack of credibility of the State's expert, and the lay testimony which corroborated the defense expert's conclusion that the defendant was insane).

Moreover, even though Dr. Nadkarni and Dr. Gutzman did not examine defendant immediately upon his arrest, in coming to their conclusions, both experts had before them an abundance of information concerning defendant's behavior and psychological state before, during, and after the crime. Both experts testified that they based their opinion that defendant was legally insane at the time of the crime in large part on records of events shortly after the incident. Both experts examined the police reports which described defendant's bizarre behavior during that period, defendant's own statement to police immediately after the crime, as well as the admission records from the prison hospital where defendant was admitted immediately upon his arrest, and concluded that all of these documents supported their opinion.

The records from the prison hospital revealed that upon admission the intake workers noted that defendant "appears to be paranoid and having acted on delusion," and further that although defendant's "insight is fair," his "impulse control" and "judgement" are poor. The records further revealed that defendant was diagnosed with schizo-affective disorder, requiring immediate hospitalization in the inpatient psychiatric unit, where he was treated with "extensive

psychotropic medication" to stabilize his psychosis, and that it took a week before he was deemed stable enough to be discharged to the residential. While in the inpatient psychiatric unit, defendant exhibited symptoms consistent with those he exhibited during the incident and during many of his prior hospitalizations, including being "highly religiously preoccupied," "anxious," "restless," "highly emotionally charged," as well as "experiencing hallucinations with Satanic themes." The records from the prison hospital further reveal that despite treatment with medication, a month after his arrest, defendant required readmission to the inpatient psychiatric unit as a result of returned psychotic symptoms, including an increase in disorganized thought and behavior.

Both experts further testified that upon admission to the prison hospital, it took defendant seven months and heavy anti-psychotic medication, including Clozaril, to restore him to fitness to stand trial. Both experts explained that Clozaril is a drug of last resort used in the treatment of delusions, hallucinations, disorganized thought and other psychotic and bizarre behavior associated with schizophrenia, and that it is a rarely used drug because it has potentially serious, life-threatening side effects, so that even the drug manufacturers will not provide the treating physicians with a dosage until the patient's blood results have been submitted to them. Dr. Gutzman further testified that defendant's medical records after his arrest revealed that on each occasion that he had missed a dose of Clozaril, his condition rapidly deteriorated, with defendant immediately beginning to exhibit symptoms of his psychosis, including, *inter alia*, heavy praying and aggressiveness.

Despite the aforementioned undisputed facts, supporting the credibility of the two expert

opinions, the trial court rejected the testimony of the two experts, finding that each lacked sufficient credibility. Specifically, with respect to Dr. Gutzman, the trial judge asserted that she did not credit Dr. Gutzman's opinion with much weight because Dr. Gutzman "chose" not to perform any malingering tests on defendant, and because on cross-examination she conceded that she was just "assuming things." The trial judge similarly rejected Dr. Nadkarni's opinion, asserting that Dr. Nadkarni had failed to go over the events in the police reports, so as to properly question defendant about the events on the date of the crime.

We find the trial judge's rejection of Dr. Gutzman's testimony on the basis of her "choice" not to perform malingering tests on defendant unsubstantiated by the record. The evidence presented at trial leaves no possibility for malingering as everyone agreed that defendant was psychotic at the time of the occurrence, and that he had no other motivation for committing the acts with which he was charged, other than those psychotic symptoms he described to the police, the workers at the prison hospital, and the two expert psychiatrists who examined him in the following months and years. Moreover, the evidence at trial undisputedly established that these same psychotic symptoms were repeatedly exhibited by defendant and observed by numerous trained professionals in 16 years of defendant's prior psychiatric treatment, during which not a single professional reported that defendant had been malingering his symptoms.

Based on the aforementioned, Dr. Gutzman concluded that there was no need to perform malingering tests. Her conclusion was supported by that of Dr. Nadkarni, who similarly found no need for ordering malingering tests based on defendant's reported history of mental illness. Dr. Nadkarni further elaborated that had he had any suspicions whatsoever that defendant was

malingering, he certainly would have referred defendant for testing. Accordingly, we find the trial judge's conclusion rebutted by the record.

We further take issue with the trial judge's rejection of Dr. Gutzman's opinion on the basis of certain "assumptions" Dr. Gutzman's allegedly made in coming to her opinion. From a review of the record, we can discern only two alleged "assumptions" that the trial court may have been referring to: (1) Dr. Gutzman's explanation of defendant's statement to the intake psychologist at the prison hospital stating, "I have delusions"; and (2) Dr. Gutzman's explanation of defendant's actions immediately after the crime, specifically his reasons for not opening the door to Nelson and his placement of the knife inside the pantry. We disagree, however, with the trial court's characterization of Dr. Gutzman's testimony.

Dr. Gutzman testified that when defendant indicated to the intake workers at the prison hospital that he "has delusions," it was reasonable to deduce that defendant had used that term "delusions" because he had heard it during his 16 years of psychiatric treatment. We find nothing illogical or presumptuous about this conclusion. We further note that there is no reason to think that someone psychotic is mentally deficient so as not to recognize the nature of his symptoms during his quieter moments.

Similarly, when questioned about not opening the door to Nelson, Dr. Gutzman stated that it was fair to conclude that defendant, in his delusional state, would have been afraid to open the door, as in his mind, he had just fought with Satan. Moreover, defendant would not necessarily have been oblivious to the fact that Nelson was related to Satan as he may very well have been aware that Nelson lived with the victim, whom he perceived as Satan, and that he may

very well have refused to open the door in fear of retaliation from one of Satan's allies. This is fully corroborated by the testimony of lay witnesses that when the police arrived at the scene, defendant did in fact immediately open the door for them, that he immediately admitted to stabbing the victim, and that he said he did so because the victim was Satan.

Finally, with respect to defendant's placement of the knife in the pantry, Dr. Gutzman testified that there was no indication that defendant wanted to hide the knife when he placed it in the pantry. Although Dr. Gutzman admitted that she presumed that the knife belonged in the pantry, her conclusion was supported by the evidence, which established a lack of motive to conceal. As already noted above, it was undisputed that defendnat immediately led the police to the knife, without being evasive or resistant. Moreover, there was no evidence presented whatsoever that once placed inside the pantry, the knife was not left out in plain view, or that defendant did anything more to conceal or alter the knife. As Dr. Gutzman reasoned that had defendant wanted to hide the knife, he would have discarded the knife on his way to the apartment, thrown it in a trash bin inside the apartment, or in the very least, attempted to wash the blood from it.

We next address the trial judge's concerns with Dr. Nadkarni's testimony. In rejecting Dr. Nadkarni's opinion, the trial judge stated that Dr. Nadkarni "did not even know the criminal acts that were alleged to have occurred in the night in question," and "didn't even go over the police reports," or "the events in the police reports of the night that occurred." Later on, the trial court again stated:

"[I]t would seem very important that since you're talking about the stabbing that occurred

on this date in the night in question, that Dr. Nadkarni should have gone over those events of the stabbing. He did not even know events that were in the police report, did not even know the statements that were given at the night in question by defendant."

Contrary to the trial court's finding, our review of the record below reveals that Dr. Nadkarni repeatedly stated both on direct and cross-examination that in coming to his conclusion he reviewed the police reports as they were the linchpin of his determination regarding defendant's sanity at the time of the offense. Specifically, on direct examination, Dr. Nadkarni testified that prior to examining defendant on January 5, 2007, he "reviewed extensive police reports and documentation pertaining to [the] arrest incident as well as the defendant's criminal history and his given statement to police on July 24, 2005 at 03:15 hours." What's more, on direct examination, Dr. Nadkarni explained that in coming to his conclusion he reviewed the police reports "very carefully" because one of the criteria that is relevant in determining whether a patient truly suffers from a delusion at the time of the commission of the crime is the consistency of the story that he provides to multiple examiners or the police, and then testified that after reviewing these reports, he concluded that defendant's actions exhibited such a consistency.

Dr. Nadkarni reaffirmed twice more to the court that he reviewed all of the relevant police reports both during cross-examination and on redirect examination. Moreover, throughout both direct and cross-examination, Dr. Nadkarni exhibited a substantial recollection of those reports detailing the events of the incident.

The trial judge nevertheless assumed that Dr. Nadkarni's testimony was ungrounded and unstudied because on cross-examination Dr. Nadkarni admitted to being unaware: (1) that upon

running into Nelson on the stairs, defendant told Nelson that the victim had stabbed him; and (2) that Nelson later went to defendant's apartment and pounded on defendant's door, but to no avail.

First, as shall be explained below, the judge's recollection of Dr. Nadkarni's testimony was itself defective and further overlooked the fact that Dr. Nadkarni's opinion was arrived at long before he took the stand, and that this opinion was reached immediately after Dr. Nadkarni evaluated defendant, reviewing all of the pertinent records in defendant's file.

Contrary to the trial judge's conclusion, with respect to defendant's alleged statement to Nelson on the stairs, the record is clear that it would have been impossible for Dr. Nadkarni to be aware of this statement, as it was not contained in any police reports and was in fact made by Nelson for the first time at defendant's trial. Nelson admitted on cross-examination that he never told police that defendant had said "he [the victim] stabbed me" but, rather, told the police that defendant had said he had to kill the victim because the victim was a demon. We also note that when asked whether he would have changed his opinion regarding defendant's sanity had he been aware of defendant's alleged statement to Nelson, Dr. Nadkarni indicated that he would not have. Accordingly, the trial court's conclusion that Dr. Nadkarni failed to consider the police reports was contrary to the record in this case.

The trial judge was similarly mistaken about Dr. Nadkarni's awareness of Nelson's pounding on defendant's door. The record reveals that on redirect examination, Dr. Nadkarni was given a copy of the police report to refresh his memory, and he went on to clarify that at the time of his evaluation of defendant, he was in fact aware of the fact that Nelson had knocked on

defendant's apartment door to no avail. Dr. Nadkarni further testified that he did consider this information and that it did not alter his opinion of defendant's sanity at the time of the commission of the offense. In that regard we note that there is no reason to think that if defendnat had not felt culpable he would have permitted Nelson, who lived in the same household with "Satan," past his door, since when the police arrived defendant opened the door for them without hesitating.

Accordingly, for the aforementioned reasons, we find contrary to the trial judge's conclusion, that the testimony of the two experts was firmly entrenched and provided clear and convincing evidence that as a result of his delusion, defendant would not have been able to comprehend the criminality of his conduct at the time of the offense. See Wilhoite, 228 Ill. App. 3d at 26, 592 N.E.2d at 57; see also Arndt, 86 Ill. App.3d at 749-50, 408 N.E.2d at 761 (appellate court deferred to the psychiatric testimony explaining defendant's conduct in rejecting the trial court's conclusions drawn from the same facts).

The State nevertheless argues that the trial court properly concluded that the testimony of the two experts was rebutted by the testimony of the State's four lay witnesses. The State alleges that the trial judge properly concluded that defendant was able to appreciate the wrongfulness of his actions because he did not open the door to Nelson, he "hid the knife and his bloody clothing" and he made several self-serving type statements immediately following the incident. We disagree.

While the issue of sanity may be determined on the basis of lay testimony, a review of the record in the present case reveals that the lay testimony relied on by the court to counteract the

undisputed testimony of the two expert witnesses was insufficient to overcome the clear and convincing evidence offered by the experts, and in fact, in many respects actually supported defendant's contention that he was insane at the time of the commission of the offense. See Baker, 253 Ill. App. 3d at 28, 625 N.E.2d at 727.

As already noted above, none of the four lay witnesses, who observed defendant immediately during or after the commission of the crime claimed or contended that on that date defendant appeared to be sane. In fact, the testimony of all four lay witnesses supported the description of the experts that immediately before, during and after the commission of the crime defendant was suffering from a hyper-religious delusion. Specifically, Burley stipulated that during the attack, defendant yelled four or five times "Shia" as he stabbed Burley, and that Burley later learned that "Shira" means "God." Officer Hamid, who was the first police officer to arrive at the scene, testified that when defendant opened his door, he appeared to be "hysterical." Both Officer Hamid and Detective Carillo agreed that defendant told them that he stabbed the victim because the victim was Satan and had told defendant that Jesus was black and that defendant therefore had to kill him.

In addition, the evidence presented by the lay witnesses contradicted the notion that defendant had attempted to hide the discovery of what he had done. None of the witnesses testified that defendant ever attempted to deny having committed the acts with which he was charged. In fact, Officer Hamid, Detective Carillo and Nelson all agreed that defendant repeatedly stated that he had stabbed the victim. This testimony was supported by the admission records from the prison hospital, which reveal that upon admission to that hospital, instead of

denying his involvement in the crime, defendant again told intake workers that he had "seen Satan and demons today" and had stabbed a man he believed was Satan. As already noted above, the fact that defendnat told intake workers at the prison hospital that he "has delusions" is not inconsistent with the fact that he was acting under those delusions while he was committing the acts with which he was charged, so as not to appreciate their wrongfulness. As already noted above, being psychotic does not preclude a defendant's recognition of his symptoms in his quieter moments, especially where, as in this case, defendant has been diagnosed and admitted to psychiatric hospitals on more than 27 occasions in the past 16 years.

Moreover, defendant's statement made to Detective Carillo upon arrest, stipulated to by the parties at trial, corroborates the experts' opinion that defendant was acting under a psychotic delusion, the delusion that he was fulfilling a commandment from God. As already noted above, no one proffered any alternative motive or reason for defendant's actions, other than this delusion.

The State nevertheless argues that the trial judge properly found that defendant fled from the scene, and that such flight supports a finding that defendant was sane at the time of the commission of the offense. We disagree.

This argument is misleading since when one speaks of flight from a scene of the crime one imagines an attempt to ward off detection or destroy evidence, a factor not at all present in this case. Everyone agreed that instead of fleeing from the building defendant returned to his apartment in plain and open view, whereupon the arrival of the police, he immediately opened the door, led the officers to the bloody knife, and admitted to stabbing the victim.

Moreover, even if defendant would have been fleeing the scene, this would not necessarily have negated the conclusion that he was unaware of the criminality of his conduct. We have previously held that "[w]hile flight from a crime scene can be indicative of an attempt to prevent detection, such flight differs significantly from flight which is part of the defendant's insane delusions or hallucinations." Baker, 253 Ill. App. 3d at 31, 625 N.E.2d at 729; see also Wilhoite, 228 Ill. App. 3d at 26, 592 N.E.2d at 57 (noting the difference between flight to avoid punishment and flight which is part of a defendant's insane delusion in reversing trial court's decision as against the manifest weight of the evidence). Under this principle, we have previously found that a defendant's flight from the scene of a crime to a different state was part of an insane delusion and therefore negated the inference of defendant's guilt. See Baker, 253 Ill. App. 3d at 31, 625 N.E.2d at 729 (noting that flight of defendant from scene of the murders to Nebraska was indicative of defendant's paranoia, rather than his attempt to hide from detection).

In the present case, both experts testified that they had considered defendant's return to his apartment and his refusal to open the door to Nelson in coming to their conclusion that defendant was insane at the time of the crime. Both experts opined that when he returned to his apartment defendant was still under a hyper-religious delusion which continued into his admission to the prison hospital. In addition, Dr. Gutzman opined that there was nothing inconsistent in the fact that defendant locked himself in his apartment and refused to open the door to Nelson until the police arrived as he believed that he had just fought with Satan. As already elaborated above, this conclusion is supported by the fact that once Officer Hamid knocked on defendant's door, defendant opened it without hesitation. Accordingly, defendant's alleged "flight" at best reflects

60

defendant's attempt to escape retaliation at the hands of Nelson, whom, in his delusion, defendant would have equated with Satan's father or with Satan's ally or with someone who would be aggrieved by his assault on Satan.

The State further argues that the trial judge properly concluded that defendant could appreciate the wrongfulness of his actions because immediately after the incident, he made two self-serving statements: (1) the statement to Nelson on the stairs, "he stabbed me" and (2) the statement to Officer Nelson, "Jason jumped me; I stabbed him; He jumped me."[10] We disagree.

We first note that Nelson's testimony regarding defendant's statement that "he [the victim] stabbed me" was thoroughly impeached on cross-examination, when Nelson admitted that when questioned by police immediately following the incident and later at the police station, he never told officers that defendant had made any such statement, but instead stated that defendant had said that he stabbed the victim because the victim was a demon. Moreover, both experts testified that had they been informed that defendant had made any such statement to Nelson, they would not have changed their opinion that defendant was insane at the time of the occurrence.

With respect to defendant's alleged statement to Officer Hamid, we note that it is unclear from the record and the parties hotly contest whether the statement made by defendant was

---

[10]We note that in its finding the trial court noted that defendant made yet a third similar statement to the paramedics. However, our review of the record below reveals no such testimony by any witness or any similar statement contained in any police reports or reports of the psychiatrists which are part of the common law record. In fact, there is nothing in the record below to suggest that defendant ever spoke to the paramedics, let alone made such a statement.

"Jason jumped me: I stabbed him" or vice versa, "I stabbed him, he jumped me." While on direct examination Officer Hamid testified that when defendant opened the door, he stated "Jason jumped me; I stabbed him; He jumped me," Officer Hamid's report, prepared soon after the incident, as conceded to by the State, actually stated, "I stabbed him, he jumped on me." This concession by the State was made during it cross-examination of Dr. Gutzman.

Moreover, the arrest report prepared by Officer Hamid and attached as part of the common law record on appeal makes no note at all of any such defensive statement by defendant, but merely notes that defendant admitted to "stabbing the victim," over an argument about "Jesus is black." No other report prepared by Officer Hamid is attached to the record below. In addition, we note that Detective Carillo's stipulated testimony reveals that in his statement to police, only a few hours after his arrest, defendant never claimed to have been attacked by the victim but instead stated that when he stabbed the victim, "the victim did not have a weapon and had not attacked him."

Regardless of the order of the words in defendant's statement, however, both experts testified that in coming to their conclusion that defendant was insane at the time of the offense they took this version of defendant's statement into consideration and concluded that the statement was not one of self-defense. Dr. Gutzman explained that in her opinion the statement was merely a recitation of events, as the record reveals that during the struggle with defendant the victim did hold defendant's arms, pushing him back and toppling over him causing both of them to fall. Moreover, Dr. Gutzman explained that defendant's statement "he jumped me," was consistent with defendant's delusion that Jason was Satan who was to be feared.

62

No. 1-08-0657

Dr. Nadkarni similarly testified that he considered defendant's statement to police and that in his opinion it was improbable that the statement was self-serving, and that it was much more likely that defendant's statement was a response from the "mind of someone who is psychotic." Dr. Nadkarni explained that in every case there are going to be small inconsistencies and that even in a highly psychotic individuals there can be "attempts made at self-defense or other strategies," but that this will not necessarily mean that they were able to appreciate the criminality of their actions, if under a delusion resulting from psychosis.

The State further contends that the trial court properly found that defendant attempted to hide the weapon and his bloody clothing after the crime. We disagree for the reasons previously discussed.

With respect to the knife, Officer Hamid and Nelson consistently testified that when asked for the knife, defendant immediately led the officers to the knife, which he had placed in the pantry, and which still contained blood on it. There was not evidence presented whatsoever that the knife was concealed in this pantry, or that it did not belong there. Similarly, with respect to the bloody clothes, the stipulated testimony of Detective Carillo undisputedly established that the clothes were not hidden but rather were lying in plain view on the floor in defendant's bedroom. Detective Carillo's stipulated testimony further established that defendant never denied taking off his clothes, but instead he told the officers exactly what he was wearing when he stabbed the victim, and then that he removed his clothes because he feared that the blood on them would scare his mother.

Moreover, as already noted above, both experts testified that they considered defendant's

63

placement of the knife in the pantry, to which the judge alluded, as well as his disrobing after the crime, in coming to their conclusion regarding defendant's sanity, and that these factors did not impede their conclusion that at the time of the offense defendant was under a delusion so strong that he was unable to appreciate the criminality of his conduct. In fact, both experts found defendant's conduct consistent with his delusionally produced behavior, and his actions in putting the knife in the pantry and taking off his clothes, all part of one delusional episode.

For all of the aforementioned reasons, we find that the trial the trial judge's conclusion that defendant was capable of appreciating the nature of his conduct was grossly unwarranted. See People v. Garcia, 156 Ill. App.3d 417, 509 N.E.2d 600 (1987); Baker, 253 Ill. App. 3d at 29, 625 N.E.2d at 728; Wilhoite, 228 Ill. App.3d at 27-28, 592 N.E.2d at 58 (reversing trial court's finding that defendant was not legally insane as against the manifest weight of the evidence where the testimony of the State's expert witness was weak and unsupported by factual details and defendant offered credible expert testimony which considered sources relied on by the State's expert in addition to other reliable sources not considered by the State's expert); see also Arndt, 86 Ill. App. 3d at 749-50, 408 N.E.2d at 761 (reversing trial court's determination that defendant was guilty of murder where the trial court did not appear to question the credibility of the defendant's experts, but merely drew different conclusions than they did).

In that respect, we find the cases of Garcia, 156 Ill. App. 3d 417, 509 N.E.2d 600, and Baker, 253 Ill. App. 3d at 29, 625 N.E.2d at 728, instructive.[11]

_____

[11]We acknowledge that the aforementioned cases were decided under an earlier version of the insanity statute, which, as already noted above, contained a different definition of insanity and

In Baker, the appellate court reversed the trial court's finding of guilty but mentally ill, finding that it was against the manifest weight of the evidence. Baker, 253 Ill. App. 3d at 30, 625 N.E.2d at 729. In that case, defendant shot both his parents to death, while exclaiming "the father dies before the son," after a quarrel with his father over a "method of religion." Baker, 253 Ill. App. 3d at 21, 625 N.E.2d at 721. Defendant then left his parents' home, which was in Chicago, and drove to Nebraska, where he was discovered the following day after his car veered off the road and crashed into a telephone pole. When defendant was questioned by police regarding the double homicide, he told police that he had been hospitalized for psychiatric problems during the previous year and requested an attorney or a psychiatrist. Defendant subsequently confessed to the crime. Prior to trial he was examined by four experts who all opined that at the time of the commission of the offense he would have been incapable of appreciating the criminality of his conduct. Baker, 253 Ill. App. 3d at 18-27, 625 N.E.2d at 720-26.

In reversing the trial court's finding of guilty but mentally ill, the court in Baker found relevant that all four expert witnesses, three of whom were employed by the circuit court and examined defendant upon a court order, testified that defendant was delusional at the time of the commission of the offense, so as not to be capable of appreciating the criminality of his conduct.

_____

saddled defendants with a lesser burden in establishing this defense. However, all of the cases cited to by the parties, aside from McCullum, 386 Ill. App. 3d at 504, 897 N.E.2d at 796, which shall be discussed in more detail below, were decided under the same earlier version of the statute, and our research has unveiled none that discusses the current version. Accordingly, we are instructed by the cases that are before us.

The court further found relevant that the testimony of these experts was virtually unimpeached and that their conclusions were supported by the evidence of defendant's prior hospitalization for the same disease six months prior to the killings, during which he exhibited similar or nearly the same symptoms as those he displayed during the crime and the time of his arrest. See Baker, 253 Ill. App. 3d at 30, 625 N.E.2d at 729. The court in Baker also noted that the State presented no experts to testify on its behalf and that the lay testimony favoring the State was effectively explained by defendant's experts to be fully consistent with and supportive of their opinions. See Baker, 253 Ill. App. 3d at 30, 625 N.E.2d at 729.

In Garcia, the appellate court similarly reversed the trial court's finding of guilty but mentally ill as being against the manifest weight of the evidence. Garcia, 156 Ill. App. 3d at 424, 509 N.E.2d at 602. In that case, defendant, who resided with his brother Rudolfo, entered the basement where Rudolfo was sleeping with his fiancee and repeatedly stabbed his brother. Defendant then left the house and hid underneath a porch. Defendant was subsequently arrested, whereupon he admitted his actions and led the police to the location of the knife he used to stab Rudolfo. Defendant was initially found unfit to stand trial, but after six months of treatment in an inpatient psychiatric facility, including daily administration of psychotropic drugs to control his hallucinations, he was tried in a bench trial and convicted of several offenses. At defendant's trial two expert psychiatrists both opined that defendant was insane at the time of the commission of the offense, as he was psychotic and grossly delusional, believing certain spirits, whom he called "Astros" were communicating with him. Garcia, 156 Ill. App. 3d at 418-24, 509 N.E.2d at 600-04.

In reversing the trial court's finding of guilty but mentally ill, the court in Garcia, found relevant that the State offered no expert testimony while two psychiatrists testified for the defense that at the time of the commission of the offense defendant was psychotic and grossly delusional. Garcia, 156 Ill. App. 3d at 420, 509 N.E.2d at 602. As in Baker, the court in Garcia found relevant that prior to the incident, defendant had been exhibiting similar psychotic behavior for two years. Garcia, 156 Ill. App. 3d at 420-23, 509 N.E.2d at 602-05. The appellate court reversed defendant's conviction in spite of evidence establishing a previous quarrel between the victim and the defendant, and despite testimony by eyewitnesses that during the commission of the crime, defendant did not appear to be in a trance but rather appeared totally calm, and that after the commission of the crime his voice sounded normal and he appeared "totally cooperative." Garcia, 156 Ill. App. 3d at 420, 509 N.E.2d at 602. In coming to its decision, the appellate court found relevant that the two experts irrefutably found that defendant's apparent coherence at the time of the crime and immediately thereafter was not inconsistent with their diagnosis. Garcia, 156 Ill. App. 3d at 424, 509 N.E.2d at 602.

We further note that in concluding that the trial judge's decision in this case was against the manifest weight of the evidence, we have considered the cases of People v. Gilmore, 273 Ill. App. 3d 996, 1000, 653 N.E.2d 58 (1995), People v. West, 231 Ill. App. 3d 646, 596 N.E.2d 740 (1992), and McCullum, 386 Ill. App. 3d at 504, 897 N.E.2d at 796, cited to by the State. Although, we acknowledge that in each of these cases the appellate court affirmed the trial courts' findings of guilt on the basis of lay testimony alone, we find all three cases to be factually distinguishable.

In Gilmore, the defendant committed residential burglary and the circuit court found her guilty but mentally ill on the basis of several factors, including the fact that defendant had taken items from the house, that her entry was discovered by the excrement she left in the basement of the victim's residence, that after her entry had been discovered, she attempted to conceal herself by cleaning the excrement before the occupant returned to the basement, and by hiding under a blanket behind the furnace, and that when finally discovered and questioned about her presence in the basement, she did not provide a "delusional" response. Gilmore, 273 Ill. App. 3d at 999-1000, 653 N.E.2d at 60.

Unlike in the present case, however, in Gilmore, although the psychiatrists testifying on behalf of defendant opined that defendant was suffering from schizophrenia, they never testified that at the time of the crime, defendant was suffering from a delusion. Gilmore, 273 Ill. App. 3d at 999, 653 N.E.2d at 60. As already articulated above, in the present case, both experts testified that defendant had been suffering from a delusion during the commission of the offense, and defendant's actions after the stabbing corroborated the existence of the delusion, as defendant persisted in explaining both to police and the workers at the prison hospital the psychotic reasons that had led him to stab the victim, which were consistent with his hyper-religious delusion.

West is similarly distinguishable, as in that case, the experts too failed to testify that during the commission of the sexual assault upon the victim defendant had been acting under a delusion. West, 231 Ill. App. 3d at 648-51 596 N.E.2d at 741-42. In addition, unlike in the present case, lay witnesses in West clearly contradicted the experts' opinion that defendant could not appreciate the criminality of his actions, as several witnesses who observed defendant before,

during and immediately after the attack all testified that defendant appeared normal, coherent, and remorseful, and there was evidence that defendant had planned to attack the victim and after attacking her had dragged her into a secluded area to prevent detection. West, 231 Ill. App. 3d at 650-51, 596 N.E.2d at 742-43.

Finally, we find McCullum, 386 Ill. App. 3d at 504, 897 N.E.2d at 796, distinguishable on its face, as in that case, unlike in the cause at bar, there was uncontradicted testimony presented at trial that defendant had a rational motive in attacking the victim (in retaliation) and that he had planned to murder him. In McCullum, the evidence presented at trial established that after being beaten up by a security guard at White Castle, defendant returned to the restaurant several days afterward carrying a loaded gun, and sat in the restaurant for three hours observing his victim, another security guard, before standing up and shooting him. In addition, unlike here, upon his arrest the defendant in McCullum did not require psychiatric hospitalization and was immediately found fit to stand trial.

Clearly, unlike in McCullum, in the present case, there was no evidence whatsoever of any rational motive for defendant's attack on the victim. The victim and his father both testified that in the three years that they lived in the same building with defendant they had no problems with defendant, and in fact had no prior contact with defendant except for a casual "hello." The victim similarly testified that when he first saw defendant he did not feel scared or anxious because he knew the victim as his neighbor. Accordingly, under the facts of our case, the only basis upon which to explain defendant's behavior was, as articulated by both experts, his delusional episode.

IV. CONCLUSION

69

No. 1-08-0657

For all of the aforementioned reasons, we reverse the finding of the circuit court and remand for further proceedings so as to comport with the directives of section 5-2-4 of the Unified Code of Corrections (730 ILCS 5/5-2-4 (West 2008), and the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-100 *et seq.* (West 2008)), after a finding of not guilty by reason of insanity. Accordingly, we need not address the remaining arguments defendant raises on appeal.

Reversed and remanded.

CAHILL, P.J., concurs.

JUSTICE McBRIDE dissenting:

I respectfully dissent from the majority's decision to reverse the trial court's finding of guilty but mentally ill. In my opinion, this decision ignores the trial court's well-reasoned findings, the manifest weight of the evidence standard of review and case precedent.

The questions of a defendant's sanity and mental illness are questions of fact and the fact finder's resolution of these questions will not be disturbed unless contrary to the manifest weight of the evidence. People v. McCullum, 386 Ill. App. 3d 495, 504, 897 N.E.2d 787, 796 (2008). Because defendant bears the burden of proof, the State does not need to present expert testimony on the issue of sanity but may rely purely on facts in evidence and the inferences that follow from those facts. McCullum, 386 Ill. App. 3d at 504, 897 N.E.2d at 796. Bizarre or delusional statements do not compel an insanity finding as a defendant may suffer mental illness without being legally insane. McCullum, 386 Ill. App. 3d at 504, 897 N.E.2d at 796.

Although the majority acknowledges this authority and agrees a trial court is free to reject

70

expert opinion testimony, it concludes: "we can see no basis for doing so in this case." It suggests there must be substantial disagreement between the experts in order to reject those opinions. This is not the law in Illinois. Here the majority adopts defendant's argument that the trial court's decision to reject the expert opinions was against the manifest weight of the evidence. However, as the case law makes clear, the trial court is the fact finder that must determine the credibility of the witnesses and assess the weight afforded to their testimony and the evidence at trial. McCullum, 386 Ill. App. 3d at 504, 897 N.E.2d at 796.

It is not sufficient for reversal that there is evidence to support defendant's argument, or even that, were we the trier of fact, we would have found clear and convincing proof of insanity. The standard by which we must review the trial court's denial of defendant's affirmative defense is whether its decision was against the manifest weight of the evidence. For a decision to be against the manifest weight of the evidence, the opposite conclusion must be clearly evident, plain, and indisputable (In re Cathy M., 326 Ill. App. 3d 335, 341, 760 N.E.2d 579, 585 (2001)), or unreasonable, arbitrary, or not based on the evidence. People v. Urdiales, 225 Ill. 2d 354, 433, 871 N.E.2d 669, 715 (2007). I cannot agree that the trial judge's decision was against the manifest weight of the evidence.

Returning to the expert testimony in this case, it is worth noting again that such testimony may be entirely rejected by the trier of fact if he or she concludes a defendant was sane, based upon factors such as whether lay testimony is based upon observations made shortly before or after the crime, the existence of a plan for the crime, and the methods undertaken by the defendant to prevent detection. McCullum, 386 Ill. App. 3d at 504-05, 897 N.E.2d at 796. The

71

trial judge made specific findings that although defendant was mentally ill, he did not lack the substantial capacity to appreciate the criminality of his conduct. There is ample evidence in this record to support the factors listed above and the trial court's finding of guilty but mentally ill. The lay observations made before and shortly after the attempted murder are the following. The victim, Jason, saw defendant outside the building before the attack. It was dark outside and defendant approached him from behind. The two began struggling with the knife that defendant had armed himself with before the attack. Although defendant seriously wounded the victim, he stopped the attack as soon as Jason's mother screamed and asked what was going on outside. Defendant fled upstairs and immediately told Jason's father that it was Jason who had stabbed defendant. Defendant ran to his apartment, discarded the knife, took off his bloody clothes and would not open the door when Jason's father began knocking on it, demanding that the door be opened. Only when the police arrived, did defendant open the door. Defendant's first statements about the attack to the responding officer was that Jason stabbed defendant and Jason jumped on defendant. When asked about the knife, defendant first pointed to the pantry and then indicated the knife was in the kitchen pantry. Before the police arrived, defendant had already taken off his bloody clothes because he did not want his mother to become frightened at the sight of them. All this took place, as the majority states, "in the grip of a psychotic delusion."

Only after the initial meeting with the police on the scene and after time for contemplation did defendant begin ranting about Jesus and Satan. His hyper-religious delusions notwithstanding, his delayed and after-the-fact ranting illustrate that defendant, without a doubt, had the substantial capacity to appreciate the criminality of his conduct.

No. 1-08-0657

Although the majority details his longstanding mental illness and his multiple hospitalizations, on only a handful of occasions had defendant waged attacks on others. Each time defendant was being told my God or Jesus to commit the attacks. As the State argued, defendant was familiar with the system and "he use[d] the fact that God has told him to act as an excuse for his behavior as he did in this case." Defendant told authorities after his arrest that he was, indeed, suffering from " 'delusions' " and wanted to go to " 'Chester' " because it was a nice place. Chester is a mental health center where defendant had spent a considerable amount of time.

Despite his history of mental illness, the two experts could not even agree on the particular mental illness defendant suffered from. Neither one of the experts examined him close in time to the stabbing. Neither one saw any need to rule out malingering. Neither one secured the records from Dr. Reeves, who was treating defendant at or near the time of this attack. The one psychiatrist who actually was aware of defendant's mental condition near the time of this offense was never consulted.

Dr. Gutzman was not aware that defendant initially tried to shift blame for the crime to the victim. Additionally, and certainly damaging to Dr. Gutzman's credibility was the fact that when she interviewed defendant regarding his sanity after he had been restored to fitness, she only examined him for 25 minutes and did not ask defendant one single question about the crime or the actions he took that day.

The majority seems to suggest that because there was no motive other than the defendant's subsequent delusional statements about the victim being Satan and that God had

73

directed him to kill Satan, the psychiatric expert testimony must be accepted. I disagree. Any number of crimes could be termed senseless and seemingly without any rational motive. As pointed out above, bizarre behavior and delusional statements do not compel an insanity finding because a defendant may suffer mental illness without being legally insane. Moreover, the factors to look at in this case are not defendant's motives, but lay observations made shortly before or after the crime, the existence of a plan, and the methods undertaken to prevent detection. McCullum, 386 Ill. Ap. 3d at 505, 897 N.E.2d at 796. These factors were established at defendant's bench trial.

Simply because defendant fled for his own apartment does not negate the fact that he committed this crime after dark, when the victim was alone. Defendant also approached the victim from behind, obviously attempting to catch Jason off guard. Defendant attacked the victim with a knife and struggled with him, but fled upon hearing Jason's mother screaming. Defendant accused the victim of being the attacker, refused entry to Jason's father, and he hid the knife and took off the bloody clothes that he was wearing. It was reasonable for the trial court to infer that defendant did all these things because he had a plan and wanted to prevent detection. Again, because defendant was not successful in evading the police does not mean he was insane at the time of this offense. The trial court did not have to accept the conclusions of two doctors who examined defendant for his sanity long after the fact and for less than two hours in total. The trial court listened to the witnesses, weighed the evidence, made reasonable findings, and did not conclude that defendant was insane at the time he committed this offense. I would affirm the finding of guilty but mentally ill and the sentence imposed.

74